NORMAN THOMAS, RELATOR, v. DANIEL CASEY, DIRECTOR OF PUBLIC SAFETY OF JERSEY CITY, RESPONDENT.

Argued October 4, 1938—Decided October 18, 1938.

Before BROGAN, CHIEF JUSTICE, and Justices BODINE and HEHER.

For the relator, *Arthur T. Vanderbilt.*

For the respondent, *James A. Hamill.*

BODINE, J. The relator, often a candidate of the Socialist party for high office, seeks in this proceeding to compel the director of public safety of Jersey City to issue to him a permit for a meeting to be held sometime in the future in Journal Square, or in some other place in that city, in order that he may deliver an address to those interested in the views

he holds on public questions. He has, for years, been a close student of the social and economic order and his books and writings have been widely read. Many of the citizens of Jersey City are, however, out of sympathy with the views he has often expressed, and protested to the director against permitting a socialist meeting in Journal Square, or in other highways and parks under the control of the city. Italics wherever they appear without other note are mine.)

The legislature of the state delegated to the municipal government of Jersey City power to pass ordinances to preserve the public peace and order. *Rev. Stat.* 40:48-1. Pursuant to that authority, the city adopted an ordinance which provides as follows: "1. From and after the passage of this ordinance, no public parades or public assembly in or upon the public streets, highways, public parks or public buildings of Jersey City shall take place or be conducted until a permit shall be obtained from the Director of Public Safety. 2. The Director of Public Safety is hereby authorized and empowered to grant permits for parades and public assembly, upon application made to him at least three days prior to the proposed parade or public assembly. 3. *The Director of Public Safety is hereby authorized to refuse to issue said permit when,* after investigation of all of the facts and circumstances pertinent to said application, *he believes it to be proper to refuse the issuance thereof; provided, however, that said permit shall only be refused for the purpose of preventing riots, disturbances or disorderly assemblage.* 4. Any person or persons violating any of the provisions of this ordinance shall upon conviction before a police magistrate of the city of Jersey City be punished by a fine not exceeding two hundred dollars or imprisonment in the Hudson County Jail for a period not exceeding ninety days or both."

It is to be noted that the above ordinance forbids parades or public assembly in the highways and parks of Jersey City without a permit, and the director of public safety is authorized to refuse a permit when, after investigation, he believes that the refusal is necessary in order to prevent riots, disturbances or disorderly conduct.

The Constitution of New Jersey, article 1, paragraph 5, provides that: "Every person may freely speak, write and publish his sentiments on all subjects, being responsible for the abuse of that right. No law shall be passed to restrain or abridge the liberty of speech or of the press." Paragraph 18 of the same article provides: "The people have the right freely to assemble together, to consult for the common good, to make known their opinions to their representatives and to petition for redress of grievances."

The Constitution of the United States in the first amendment provides: *"Congress shall make no law* respecting an establishment of religion, or prohibiting the free exercise thereof, *or abridging the freedom of speech,* or the press; *or the right of the people peaceably to assemble,* and to petition government for a redress of grievances."

"That this amendment was intended to secure to every citizen an absolute right to speak, or write or print, whatever he might please, without any responsibility, public or private, therefor, is a supposition too wild to be indulged by any rational man. * * * It is plain, then, that the language of this amendment imports no more, than that every man shall have a right to speak, write, and print his opinions upon any subject whatsoever, without any prior restraint, so always, that he does not injure any other person in his rights, person, property, or reputation; *and so always, that he does not thereby disturb the public peace, or attempt to subvert the government."* 3 *Story's Commentaries* 731.

"The first amendment was written by men to whom Wilkes and Junius were household words, who intended to wipe out the common law of sedition, and make further prosecutions for criticism of the government, without any incitement to law-breaking, forever impossible in the United States of America. * * * Although the free speech clauses were directed primarily against the sedition prosecutions of the immediate past, it must not be thought that they would permit unlimited previous restraint. They must also be interpreted in the light of more remote history. The framers of those clauses did not invent the conception of freedom of

speech as a result of their own experience of the last few years. The idea had been gradually molded in men's minds by centuries of conflict. It was the product of a people of whom the framers were merely the mouthpiece. Its significance was not fixed by their personality, but was the endless expression of a civilization. It was formed out of past resentment against the royal control of the press under the Tudors, against the Star Chamber and the pillory, against the Parliamentary censorship which Milton condemned in his 'Areopagitica,' by recollections of heavy newspaper taxation, by hatred of the suppression of thought which went on vigorously on the Continent during the eighteenth century. Blackstone's views also had undoubted influence to bar out previous restraint. The censor is the most dangerous of all the enemies of liberty of the press, and cannot exist in this country unless made necessary by extraordinary perils. Moreover, the meaning of the First Amendment did not crystallize in 1791. The framers would probably have been horrified at the thought of protecting books by Darwin or Bernard Shaw, but 'liberty of speech' is no more confined to the speech they thought permissible than 'commerce' in another clause is limited to the sailing vessels and horse-drawn vehicles of 1787. Into the making of the constitutional conception of free speech have gone, not only men's bitter experience of the censorship and sedition prosecutions before 1791, but also the subsequent development of the law of fair comment in civil defamation, and the philosophical speculations of John Stuart Mill. Mr. Justice Holmes phrases the thought with even more than his habitual felicity. 'The provisions of the Constitution are not mathematical formulas having their essence in their form; they are organic living institutions transplanted from English soil.' " Professor Chaffee, "Freedom of Speech in War Time," 32 *H. L. R.* 947, 954.

In *Schenck* v. *United States,* 249 *U. S.* 47 (at *p.* 52), upholding the constitutionality of the Espionage act of June 15th, 1917, Mr. Justice Holmes said: "We admit that in many places and in ordinary times the defendants in saying all that was said in the circular would have been within their

constitutional rights. But the character of every act depends upon the circumstances in which it is done. *Aikens* v. *Wisconsin*, 195 *U. S.* 194, 205, 206. The most stringent protection of free speech would not protect a man in falsely shouting fire in a theatre and causing a panic. It does not even protect a man from an injunction against uttering words that may have all the effect of force. *Gompers* v. *Bucks Stove and Range Co.*, 221 *U. S.* 418, 439."

Mr. Chief Justice Hughes in *De Jonge* v. *Oregon*, 299 *U. S.* 353, said: "Freedom of speech and of the press are fundamental rights which are safeguarded by the due process clause of the Fourteenth Amendment of the Federal Constitution. * * * The right of peaceable assembly is a right cognate to those of free speech and free press and is equally fundamental. As this court said in *United States* v. *Cruikshank*, 92 *U. S.* 542, 552; 23 *L. Ed.* 588: 'The very idea of a government, republican in form, implies a right on the part of its citizens to meet peaceably for consultation in respect to public affairs and to petition for a redress of grievances.' The First Amendment of the Federal Constitution expressly guarantees that right against abridgment by Congress. But explicit mention there does not argue exclusion elsewhere. For the right is one that cannot be denied without violating those fundamental principles of liberty and justice which lie at the base of all civil and political institutions—principles which the Fourteenth Amendment embodies in the general terms of its due process clause. * * * *These rights may be abused by using speech or press or assembly in order to incite to violence and crime. The people through their legislatures may protect themselves against that abuse. But the legislative intervention can find constitutional justification only by dealing with the abuse.* The rights themselves must not be curtailed. The greater the importance of safeguarding the community from incitements to the overthrow of our institutions by force and violence, the more imperative is the need to preserve inviolate the constitutional rights of free speech, free press and free assembly in order to maintain the opportunity for free political discussion, to the end that

government may be responsive to the will of the people and that changes, if desired, may be obtained by peaceful means. Therein lies the security of the Republic, the very foundation of constitutional government." It should be noted that the Supreme Court in that case was not dealing with an application for a permit to hold a public meeting in the public streets of a municipality, but was dealing with the constitutionality of a law of the State of Oregon relating to criminal syndicalism.

The present case in no sense involves the relator's right to speak as he pleases within the confines of the state and federal constitutions. However, he may not speak in public places in Jersey City without the permit of the properly constituted authorities, even though with such permit he would be justified in making the speech intended. The public have a right to the uninterrupted enjoyment of the highways and parks maintained at public expense. They have a right to freedom of movement and the quiet they desire. In this state it has long been settled that: "The streets of a city are common highways, primarily designed for the use of the public in passing and repassing and in such temporary occupancy as is incidental to the exercise of those rights. *No one is justified in obstructing a public street by collecting therein a large assemblage of people for the purpose of delivering an address to them.* The common highways of the state are not designed for the purpose of holding public meetings therein, and anyone who attempts to do this, without having first obtained permission from the public authorities in charge of such highways, commits a public nuisance. The constitutional guaranty of liberty of speech no more authorizes a citizen to appropriate to his own use the public property of a community for the purpose of exercising that guaranty than it permits him to occupy *in invitum* the private property of a fellow citizen for the same purpose. In order to protect the public in the full enjoyment of the city streets, the municipal authorities are clothed with the power of seeing that such enjoyment is not unnecessarily interfered with; and, in the exercise of that power, to take all reasonable steps to pre-

vent such interferences." *Harwood* v. *Trembley,* 97 *N. J. L.* 173, 175.

Mr. Justice Holmes in *Commonwealth* v. *Davis,* 162 *Mass.* 510; 39 *N. E. Rep.* 113, in passing upon legislation and ordinances relating to the use of the Boston Common said: "There is no evidence before us to show that the power of the legislature over the common is less than its power over any other park dedicated to the use of the public or over public streets, the legal title to which is in a city or town. *Lincoln* v. *Boston,* 148 *Mass.* 578, 580; 20 *N. E. Rep.* 329. As representative of the public, it may and does exercise control over the use which the public may make of such places, and it may and does delegate more or less of such control to the city or town immediately concerned. *For the legislature* absolutely or conditionally *to forbid public speaking in a highway or public park is no more an infringement of the rights of a member of the public than for the owner of a private house to forbid it in his house."* The Supreme Court of the United States (167 *U. S.* 43) in reviewing that case held: "The ordinance of the city of Boston which provides that 'no person shall, in or upon any of the public grounds, make any public address,' &c., 'except in accordance with a permit from the mayor,' is not in conflict with the Constitution of the United States and the first section of the Fourteenth Amendment thereof."

Similar legislation and ordinances have been held valid in Pennsylvania, New York and Illinois. *City of Duquesne* v. *Fincke,* 112 *Atl. Rep.* 130; *People, ex rel. Doyle* v. *Atwell,* 232 *N. Y.* 96; *People* v. *Smith,* 263 *Id.* 255, and *Coughlin* v. *Chicago Park District,* 4 *N. E. Rep.* (2d) 1. And seems never to have been judicially questioned elsewhere.

The ordinance in question pursuant to legislative grant, as it has been held in *Harwood* v. *Trembley, supra,* does not offend the constitution of this state or of the federal government. The relator may freely speak in any proper place. He has spoken in schools and churches in Jersey City. He has no more right to speak in public places in that city, such as highways and parks, without permit than he has to invade

a citizen's home without invitation. The director of public safety knows the temper of the people he serves. The record indicates that many citizens have strongly protested against the use of the public highways for a demonstration by the Socialist party. Veteran organizations have filed petitions of protest. That the police could quell any disorder is no reason to grant a permit which might lead to disorder and a possible injury to innocent persons. The public are entitled to their tranquility, and the discretion to issue the permit in question is vested in the chosen representatives of the city.

"Free speech, like every form of freedom, goes in danger of its life in war time. The other day in Russia an Englishman came on a street meeting shortly after the first revolution had begun. An extremist was addressing the gathering and telling them that they were fools to go on fighting, that they ought to refuse and go home, and so forth. The crowd grew angry, and some soldiers were for making a rush at him; but the chairman, a big burly peasant, stopped them with these words: 'Brother, you know that our country is now a country of free speech. We must listen to this man, we must let him say anything he will. But, brothers, when he's finished, we'll bash his head in." John Galsworthy, "American and Briton," 8 *Yale Rev.* 27 (October, 1918).

Often a public speaker is subjected to rough handling even in this country. When opposition to a speaker's views run high, no reason exists for subjecting the speaker and innocent bystanders to dangers of assault.

Where, as here, the issuance of a permit rests in the sound discretion of a municipal officer, his action will not be lightly disturbed. There is nothing in the record that indicates that the director's refusal was arbitrary or capricious. He made a thorough investigation and believes that disturbances would result if the permit was granted.

The application for a peremptory writ will, therefore, be denied.