## NIEMOTKO *v.* MARYLAND.

NO. 17.

Argued October 17, 1950.—Decided January 15, 1951.

*Hayden C. Covington* argued the cause and filed a brief for appellants.

*Kenneth C. Proctor,* Assistant Attorney General of Maryland, argued the cause for appellee. With him on the brief was *Hall Hammond,* Attorney General.

MR. CHIEF JUSTICE VINSON delivered the opinion of the Court.

Appellants are two members of the religious group known as Jehovah's Witnesses. At the invitation of local coreligionists, they scheduled Bible talks in the public park of the city of Havre de Grace, Maryland. Although there is no ordinance prohibiting or regulating the use of this park, it has been the custom for organizations and individuals desiring to use it for meetings and celebrations of various kinds to obtain permits from the Park Commissioner. In conformity with this practice, the group requested permission of the Park Commissioner for use of the park on four consecutive Sundays in June and July, 1949. This permission was refused.

Having been informed that an Elks' Flag Day ceremony was scheduled for the first Sunday, the applicants did not pursue their request for the use of the park for that particular day, but, instead, filed a written request with the City Council for the following three Sundays. This

request was filed at the suggestion of the Mayor, it appearing that under the custom of the municipality there is a right of appeal to the City Council from the action of the Park Commissioner. The Council held a hearing at which the request was considered. At this hearing the applicants and their attorney appeared. The request was denied.

Because they were awaiting the decision of the Council on their application, the applicants took no further steps on the second Sunday, but, after the denial of the request, they proceeded to hold their meeting on the third Sunday. No sooner had appellant Niemotko opened the meeting and commenced delivering his discourse, than the police, who had been ordered to the park by the Mayor, arrested him. At the meeting held in the park on the fourth and following Sunday, appellant Kelley was arrested before he began his lecture.

Appellants were subsequently brought to trial before a jury on a charge of disorderly conduct under the Maryland disorderly conduct statute. Flack's Md. Ann. Code, 1939 (1947 Cum. Supp.), Art. 27, § 131. They were convicted and each fined $25 and costs. Under the rather unique Maryland procedure, the jury is the judge of the law as well as the facts. Md. Const., Art. XV, § 5; see opinion below, — Md. —, —, 71 A. 2d 9, 11. This means that there is normally no appellate review of any question dependent on the sufficiency of the evidence. Relying on this Maryland rule, the Court of Appeals declined to review the case under its normal appellate power, and further declined to take the case on certiorari, stating that the issues were not "matters of public interest" which made it desirable to review. Being of opinion that the case presented substantial constitutional issues, we noted probable jurisdiction, the appeal being properly here under 28 U. S. C. § 1257 (2).

In cases in which there is a claim of denial of rights under the Federal Constitution, this Court is not bound by the conclusions of lower courts, but will reexamine the evidentiary basis on which those conclusions are founded. See *Feiner* v. *New York,* decided this day, *post,* p. 315. A brief recital of the facts as they were adduced at this trial will suffice to show why these convictions cannot stand. At the time of the arrest of each of these appellants, there was no evidence of disorder, threats of violence or riot. There was no indication that the appellants conducted themselves in a manner which could be considered as detrimental to the public peace or order. On the contrary, there was positive testimony by the police that each of the appellants had conducted himself in a manner beyond reproach. It is quite apparent that any disorderly conduct which the jury found must have been based on the fact that appellants were using the park without a permit, although, as we have indicated above, there is no statute or ordinance prohibiting or regulating the use of the park without a permit.

This Court has many times examined the licensing systems by which local bodies regulate the use of their parks and public places. See *Kunz* v. *New York,* decided this day, *post,* p. 290. See also *Saia* v. *New York,* 334 U. S. 558 (1948); *Hague* v. *C. I. O.,* 307 U. S. 496 (1939); *Lovell* v. *Griffin,* 303 U. S. 444 (1938). In those cases this Court condemned statutes and ordinances which required that permits be obtained from local officials as a prerequisite to the use of public places, on the grounds that a license requirement constituted a prior restraint on freedom of speech, press and religion, and, in the absence of narrowly drawn, reasonable and definite standards for the officials to follow, must be invalid. See *Kunz* v. *New York, post,* p. 290. In the instant case we are met with no ordinance or statute regulating or prohibiting the use of the park; all that is here is an amor-

phous "practice," whereby all authority to grant permits for the use of the park is in the Park Commissioner and the City Council. No standards appear anywhere; no narrowly drawn limitations; no circumscribing of this absolute power; no substantial interest of the community to be served. It is clear that all that has been said about the invalidity of such limitless discretion must be equally applicable here.

This case points up with utmost clarity the wisdom of this doctrine. For the very possibility of abuse, which those earlier decisions feared, has occurred here. Indeed, rarely has any case been before this Court which shows so clearly an unwarranted discrimination in a refusal to issue such a license. It is true that the City Council held a hearing at which it considered the application. But we have searched the record in vain to discover any valid basis for the refusal. In fact, the Mayor testified that the permit would probably have been granted if, at the hearing, the applicants had not started to "berate" the Park Commissioner for his refusal to issue the permit. The only questions asked of the Witnesses at the hearing pertained to their alleged refusal to salute the flag, their views on the Bible, and other issues irrelevant to unencumbered use of the public parks. The conclusion is inescapable that the use of the park was denied because of the City Council's dislike for or disagreement with the Witnesses or their views. The right to equal protection of the laws, in the exercise of those freedoms of speech and religion · protected by the First and Fourteenth Amendments, has a firmer foundation than the whims or personal opinions of a local governing body.

In this Court, it is argued that state and city officials should have the power to exclude religious groups, as such, from the use of the public parks. But that is not this case. For whatever force this contention could possibly have is lost in the light of the testimony of the Mayor

at the trial that within his memory permits had always been issued for religious organizations and Sunday-school picnics. We might also point out that the attempt to designate the park as a sanctuary for peace and quiet not only does not defeat these appellants, whose own conduct created no disturbance, but this position is also more than slightly inconsistent, since, on the first Sunday here involved, the park was the situs for the Flag Day ceremony of the Order of Elks.

It thus becomes apparent that the lack of standards in the license-issuing "practice" renders that "practice" a prior restraint in contravention of the Fourteenth Amendment, and that the completely arbitrary and discriminatory refusal to grant the permits was a denial of equal protection. Inasmuch as the basis of the convictions was the lack of the permits, and that lack was, in turn, due to the unconstitutional defects discussed, the convictions must fall.

*Reversed.*

MR. JUSTICE BLACK concurs in the result.

MR. JUSTICE FRANKFURTER, concurring in the result.*

The issues in these cases concern living law in some of its most delicate aspects. To smother differences of emphasis and nuance will not help its wise development. When the way a result is reached may be important to results hereafter to be reached, law is best respected by individual expression of opinion.

These cases present three variations upon a theme of great importance. Legislatures, local authorities, and the courts have for years grappled with claims of the right to disseminate ideas in public places as against claims of an effective power in government to keep the

---

*[In this case, No. 50, *Kunz* v. *New York, post,* p. 290, and No. 93, *Feiner* v. *New York, post,* p. 315.]

peace and to protect other interests of a civilized community. These cases are of special interest because they show the attempts of three communities to meet the problem in three different ways. It will, I believe, further analysis to use the three situations as cross-lights on one another.

## I.

1. *Nos. 17 and 18.*—Havre de Grace, Maryland, sought to solve this tangled problem by permitting its park commissioner and city council to act as censors. The city allowed use of its park for public meetings, including those of religious groups, but by custom a permit was required. In this case, the city council questioned the representatives of Jehovah's Witnesses, who had requested a license, about their views on saluting the flag, the Catholic Church, service in the armed forces, and other matters in no way related to public order or public convenience in use of the park. The Mayor testified that he supposed the permit was denied "because of matters that were brought out at [the] meeting." When Niemotko and Kelley, Jehovah's Witnesses, attempted to speak, they were arrested for disturbing the peace. There was no disturbance of the peace and it is clear that they were arrested only for want of a permit.

2. *No. 50.*—New York City set up a licensing system to control the use of its streets and parks for public religious services. The New York Court of Appeals construed the city's ordinance so as to sanction the right of the Police Commissioner to revoke or refuse a license for street-preaching if he found the person was likely to "ridicule" or "denounce" religion. In 1946, after hearings before a Fourth Deputy Police Commissioner, Kunz's license was revoked because he had "ridiculed" and "denounced" religion while speaking in one of New York's crowded centers, and it was thought likely that he would continue

to do so. In 1947 and 1948 he was refused a license on the sole ground of the determination made in 1946. In September of 1948 he was arrested for speaking at Columbus Circle without a license.

3. *No. 93.*—Syracuse, New York, did not set up a licensing system but relied on a statute which is in substance an enactment of the common-law offense of breach of the peace. Feiner, the defendant, made a speech near the intersection of South McBride and Harrison Streets in Syracuse. He spoke from a box located on the parking between the sidewalk and the street, and made use of sound amplifiers attached to an automobile. A crowd of 75 to 80 persons gathered around him, and several pedestrians had to go into the highway in order to pass by. Two policemen observed the meeting. In the course of his speech, Feiner referred to the Mayor of Syracuse as a "champagne-sipping bum," to the President as a "bum," and to the American Legion as "Nazi Gestapo agents." Feiner also indicated in an excited manner that Negroes did not have equal rights and should rise up in arms. His audience included a number of Negroes.

One man indicated that if the police did not get the speaker off the stand, he would do it himself. The crowd, which consisted of both those who opposed and those who supported the speaker, was restless. There was not yet a disturbance but, in the words of the arresting officer whose story was accepted by the trial judge, he "stepped in to prevent it from resulting in a fight. After all there was angry muttering and pushing." Having ignored two requests to stop speaking, Feiner was arrested.

## II.

Adjustment of the inevitable conflict between free speech and other interests is a problem as persistent as it is perplexing. It is important to bear in mind that this Court can only hope to set limits and point the way. It

falls to the lot of legislative bodies and administrative officials to find practical solutions within the frame of our decisions. There are now so many of these decisions, arrived at by the *ad hoc* process of adjudication, that it is desirable to make a cruise of the timber.

In treating the precise problem presented by the three situations before us—how to reconcile the interest in allowing free expression of ideas in public places with the protection of the public peace and of the primary uses of streets and parks—we should first set to one side decisions which are apt to mislead rather than assist. Contempt cases and convictions under State and Federal statutes aimed at placing a general limitation upon what may be said or written, bring additional factors into the equation. Cases like *Near* v. *Minnesota,* 283 U. S. 697, and *Grosjean* v. *American Press Co.,* 297 U. S. 233, are rooted in historic experience regarding prior restraints on publication. They give recognition to the role of the press in a democracy, a consideration not immediately pertinent. The picketing cases are logically relevant since they usually involve, in part, dissemination of information in public places. But here also enter economic and social interests outside the situations before us. See *Hughes* v. *Superior Court,* 339 U. S. 460, 464–465.

The cases more exclusively concerned with restrictions upon expression in its divers forms in public places have answered problems varying greatly in content and difficulty.

1. The easiest cases have been those in which the only interest opposing free communication was that of keeping the streets of the community clean. This could scarcely justify prohibiting the dissemination of information by handbills or censoring their contents. In *Lovell* v. *Griffin,* 303 U. S. 444, an ordinance requiring a permit to distribute pamphlets was held invalid where the licensing standard was "not limited to ways which might be

regarded as inconsistent with the maintenance of public order or as involving disorderly conduct, the molestation of the inhabitants, or the misuse or littering of the streets." *Id.*, at 451. In *Hague* v. *C. I. O.*, 307 U. S. 496, a portion of the ordinance declared invalid prohibited the distribution of pamphlets. In *Schneider* v. *State*, 308 U. S. 147, three of the four ordinances declared invalid by the Court prohibited the distribution of pamphlets. In *Jamison* v. *Texas*, 318 U. S. 413, the Court again declared invalid a municipal ordinance prohibiting the distribution of all handbills.

2. In a group of related cases, regulation of solicitation has been the issue. Here the opposing interest is more substantial—protection of the public from fraud and from criminals who use solicitation as a device to enter homes. The fourth ordinance considered in *Schneider* v. *State, supra,* allowed the chief of police to refuse a permit if he found, in his discretion, that the canvasser was not of good character or was canvassing for a project not free from fraud. The ordinance was found invalid because the officer who could, in his discretion, make the determinations concerning "good character" and "project not free from fraud" in effect held the power of censorship. In *Cantwell* v. *Connecticut,* 310 U. S. 296, conviction was, in part, under a State statute requiring a permit for religious solicitation. The statute was declared invalid because the licensing official could determine what causes were religious, allowing a "censorship of religion." *Id.*, at 305. Again, in *Largent* v. *Texas,* 318 U. S. 418, an ordinance requiring a permit from the mayor, who was to issue the permit only if he deemed it "proper or advisable," was declared invalid as creating an administrative censorship. The Court has also denied the right of those in control of a company town or Government housing project to prohibit solicitation by Jehovah's Witnesses. *Marsh* v. *Alabama,*

326 U. S. 501; *Tucker* v. *Texas,* 326 U. S. 517. In *Thomas* v. *Collins,* 323 U. S. 516, the solicitation was in the interest of labor rather than religion. There a State statute requiring registration of labor organizers was found unconstitutional when invoked to enjoin a speech in a public hall. The interest of the State in protecting its citizens through the regulation of vocations was deemed insufficient to support the statute.

3. Whether the sale of religious literature by Jehovah's Witnesses can be subjected to nondiscriminatory taxes on solicitation has introduced another opposing interest—the right of the community to raise funds for the support of the government. In *Jones* v. *Opelika,* 319 U. S. 103, vacating 316 U. S. 584, and in *Murdock* v. *Pennsylvania,* 319 U. S. 105, the Court held that imposition of the tax upon itinerants was improper. In *Follett* v. *McCormick,* 321 U. S. 573, the Court went further to hold unconstitutional the imposition of a flat tax on book agents upon a resident who made his living selling religious books.

4. *Martin* v. *Struthers,* 319 U. S. 141, represents another situation. An ordinance of the City of Struthers, Ohio, forbade knocking on the door or ringing the doorbell of a residence in order to deliver a handbill. Prevention of crime and assuring privacy in an industrial community where many worked on night shifts, and had to obtain their sleep during the day, were held insufficient to justify the ordinance in the case of handbills distributed on behalf of Jehovah's Witnesses.

5. In contrast to these decisions, the Court held in *Prince* v. *Massachusetts,* 321 U. S. 158, that the application to Jehovah's Witnesses of a State statute providing that no boy under 12 or girl under 18 should sell periodicals on the street was constitutional. Claims of immunity from regulation of religious activities were subordinated to the interest of the State in protecting its children.

6. Control of speeches made in streets and parks draws on still different considerations—protection of the public peace and of the primary uses of travel and recreation for which streets and parks exist.

(a) The pioneer case concerning speaking in parks and streets is *Davis* v. *Massachusetts,* 167 U. S. 43, in which this Court adopted the reasoning of the opinion below written by Mr. Justice Holmes, while on the Massachusetts Supreme Judicial Court. *Commonwealth* v. *Davis,* 162 Mass. 510, 39 N. E. 113. The Boston ordinance which was upheld required a permit from the mayor for any person to "make any public address, discharge any cannon or firearm, expose for sale any goods, . . ." on public grounds. This Court respected the finding that the ordinance was not directed against free speech but was intended as "a proper regulation of the use of public grounds." 162 Mass. at 512, 39 N. E. at 113.

An attempt to derive from *dicta* in the *Davis* case the right of a city to exercise any power over its parks, however arbitrary or discriminatory, was rejected in *Hague* v. *C. I. O., supra.* The ordinance presented in the *Hague* case required a permit for meetings on public ground, the permit to be refused by the licensing official only "for the purpose of preventing riots, disturbances or disorderly assemblage." *Id.,* at 502. The facts of the case, however, left no doubt that the licensing power had been made an "instrument of arbitrary suppression of free expression of views on national affairs." *Id.,* at 516. And the construction given the ordinance in the State courts gave the licensing officials wide discretion. See *Thomas* v. *Casey,* 121 N. J. L. 185, 1 A. 2d 866. The holding of the *Hague* case was not that a city could not subject the use of its streets and parks to reasonable regulation. The holding was that the licensing officials could not be given power arbitrarily to suppress free expression, no matter under what cover of law they purported to act.

*Cox* v. *New Hampshire,* 312 U. S. 569, made it clear that the United States Constitution does not deny localities the power to devise a licensing system if the exercise of discretion by the licensing officials is appropriately confined. A statute requiring a permit and license fee for parades had been narrowly construed by the State courts. The license could be refused only for "considerations of time, place and manner so as to conserve the public convenience," and the license fee was "to meet the expense incident to the administration of the Act and to the maintenance of public order in the matter licensed." *Id.,* at 575–576, 577. The licensing system was sustained even though the tax, ranging from a nominal amount to $300, was determined by the licensing officials on the facts of each case.

(b) Two cases have involved the additional considerations incident to the use of sound trucks. In *Saia* v. *New York,* 334 U. S. 558, the ordinance required a license from the chief of police for use of sound amplification devices in public places. The ordinance was construed not to prescribe standards to be applied in passing upon a license application. In the particular case, a license to use a sound truck in a small city park had been denied because of complaints about the noise which resulted when sound amplifiers had previously been used in the park. There was no indication that the license had been refused because of the content of the speeches. Nevertheless, the Court held the ordinance unconstitutional. In *Kovacs* v. *Cooper,* 336 U. S. 77, part of the Court construed the ordinance as allowing conviction for operation of any sound truck emitting "loud and raucous" noises, and part construed the ordinance to ban all sound trucks. The limits of the decision of the Court upholding the ordinance are therefore not clear, but the result in any event does not leave the *Saia* decision intact.

(c) On a few occasions the Court has had to pass on a limitation upon speech by a sanction imposed after the event rather than by a licensing statute. In *Cantwell* v. *Connecticut, supra,* one of the convictions was for common-law breach of the peace. The problem was resolved in favor of the defendant by reference to *Schenck* v. *United States,* 249 U. S. 47, 52, in view of the inquiry whether, on the facts of the case, there was "such clear and present menace to public peace and order as to render him liable to conviction of the common law offense in question." 310 U. S. at 311.

In *Chaplinsky* v. *New Hampshire,* 315 U. S. 568, a State statute had enacted the common-law doctrine of "fighting words": "No person shall address any offensive, derisive or annoying word to any other person who is lawfully in any street or other public place, nor call him by any offensive or derisive name . . . ." The State courts had previously held the statute applicable only to the use in a public place of words directly tending to cause a breach of the peace by the persons to whom the remark was addressed. The conviction of a street speaker who called a policeman a "damned racketeer" and "damned Fascist" was upheld.

7. One other case should be noted, although it involved a conviction for breach of peace in a private building rather than in a public place. In *Terminiello* v. *Chicago,* 337 U. S. 1, the holding of the Court was on an abstract proposition of law, unrelated to the facts in the case. A conviction was overturned because the judge had instructed the jury that "breach of the peace" included speech which "stirs the public to anger, invites dispute, brings about a condition of unrest, or creates a disturbance . . . ." The holding apparently was that breach of the peace may not be defined in such broad terms, certainly as to speech in a private hall.

The results in these multifarious cases have been expressed in language looking in two directions. While the Court has emphasized the importance of "free speech," it has recognized that "free speech" is not in itself a touchstone. The Constitution is not unmindful of other important interests, such as public order, if interference with free expression of ideas is not found to be the overbalancing consideration. More important than the phrasing of the opinions are the questions on which the decisions appear to have turned.

(1) What is the interest deemed to require the regulation of speech? The State cannot of course forbid public proselyting or religious argument merely because public officials disapprove the speaker's views. It must act in patent good faith to maintain the public peace, to assure the availability of the streets for their primary purposes of passenger and vehicular traffic, or for equally indispensable ends of modern community life.

(2) What is the method used to achieve such ends as a consequence of which public speech is constrained or barred? A licensing standard which gives an official authority to censor the content of a speech differs *toto cœlo* from one limited by its terms, or by nondiscriminatory practice, to considerations of public safety and the like. Again, a sanction applied after the event assures consideration of the particular circumstances of a situation. The net of control must not be cast too broadly.

(3) What mode of speech is regulated? A sound truck may be found to affect the public peace as normal speech does not. A man who is calling names or using the kind of language which would reasonably stir another to violence does not have the same claim to protection as one whose speech is an appeal to reason.

(4) Where does the speaking which is regulated take place? Not only the general classifications—streets, parks, private buildings—are relevant. The location and

size of a park; its customary use for the recreational, esthetic and contemplative needs of a community; the facilities, other than a park or street corner, readily available in a community for airing views, are all pertinent considerations in assessing the limitations the Fourteenth Amendment puts on State power in a particular situation.[1]

---

[1] In *M'Ara* v. *Magistrates of Edinburgh,* 1913 S. C. 1059, a street orator who was arrested for speaking without a license in the streets of Edinburgh, contrary to the Magistrates' proclamation, challenged the arrest. The Court of Session affirmed a holding that Magistrates had no authority to issue the proclamation because the Act of 1606 granting them authority was in desuetude. However, in his judgment, Lord Dunedin, one of the most trenchant minds in modern Anglo-American judicial history, dealt with the argument that there is an absolute right to speak in public places. Although he was applying Scots law, not a written constitution, Lord Dunedin's remarks are apposite here:

"Now the right of free speech undoubtedly exists, and the right of free speech is to promulgate your opinions by speech so long as you do not utter what is treasonable or libellous, or make yourself obnoxious to the statutes that deal with blasphemy and obscenity. But the right of free speech is a perfectly separate thing from the question of the place where that right is to be exercised. You may say what you like provided it is not obnoxious in the ways I have indicated, but that does not mean that you may say it anywhere.

"I am not going to deal with what may be the case in open spaces or public places. It seems to me that no general pronouncement upon that subject could be made, because, although for convenience sake one often speaks of open spaces or of public places, the truth is that open spaces and public places differ very much in their character, and before you could say whether a certain thing could be done in a certain place you would have to know the history of the particular place. For example, there may be certain places which are dedicated to certain uses, . . . and things that otherwise were lawful might be restrained if they interfered with the purposes of that dedication. Each of those cases must be dealt with when it arises. Here we are dealing with a street proper, because this place at the Mound is just one of the streets of the city. It is a thoroughfare, although, probably, not a very much used thoroughfare at that particular corner. In such a place there is not the slightest right in anyone to hold a meeting as such. . . ." *Id.* at 1073–1074.

## III.

Due regard for the interests that were adjusted in the decisions just canvassed affords guidance for deciding the cases before us.

1. In the *Niemotko* case, neither danger to the public peace, nor consideration of time and convenience to the public, appears to have entered into denial of the permit. Rumors that there would be violence by those opposed to the meeting appeared only after the Council made its decision, and in fact never materialized. The city allowed other religious groups to use the park. To allow expression of religious views by some and deny the same privilege to others merely because they or their views are unpopular, even deeply so, is a denial of equal protection of the law forbidden by the Fourteenth Amendment.

2. The *Kunz* case presents a very different situation. We must be mindful of the enormous difficulties confronting those charged with the task of enabling the polyglot millions in the City of New York to live in peace and tolerance. Street-preaching in Columbus Circle is done in a milieu quite different from preaching on a New England village green. Again, religious polemic does not touch the merely ratiocinative nature of man, and the ugly facts disclosed by the record of this case show that Kunz was not reluctant to offend the deepest religious feelings of frequenters of Columbus Circle. Especially in such situations, this Court should not substitute its abstract views for the informed judgment of local authorities confirmed by local courts.

I cannot make too explicit my conviction that the City of New York is not restrained by anything in the Constitution of the United States from protecting completely the community's interests in relation to its streets. But if a municipality conditions holding street meetings on the granting of a permit by the police, the basis which

guides licensing officials in granting or denying a permit must not give them a free hand, or a hand effectively free when the actualities of police administration are taken into account. It is not for this Court to formulate with particularity the terms of a permit system which would satisfy the Fourteenth Amendment. No doubt, finding a want of such standards presupposes some conception of what is necessary to meet the constitutional requirement we draw from the Fourteenth Amendment. But many a decision of this Court rests on some inarticulate major premise and is none the worse for it. A standard may be found inadequate without the necessity of explicit delineation of the standards that would be adequate, just as doggerel may be felt not to be poetry without the need of writing an essay on what poetry is.

Administrative control over the right to speak must be based on appropriate standards, whether the speaking be done indoors or out-of-doors. The vice to be guarded against is arbitrary action by officials. The fact that in a particular instance an action appears not arbitrary does not save the validity of the authority under which the action was taken.

In the present case, Kunz was not arrested for what he said on the night of arrest, nor because at that time he was disturbing the peace or interfering with traffic. He was arrested because he spoke without a license, and the license was refused because the police commissioner thought it likely on the basis of past performance that Kunz would outrage the religious sensibilities of others. If such had been the supportable finding on the basis of fair standards in safeguarding peace in one of the most populous centers of New York City, this Court would not be justified in upsetting it. It would not be censorship in advance. But here the standards are defined neither by language nor by settled construction to preclude discriminatory or arbitrary action by officials. The ordi-

nance, as judicially construed, provides that anyone who, in the judgment of the licensing officials, would "ridicule" or "denounce" religion creates such a danger of public disturbance that he cannot speak in any park or street in the City of New York. Such a standard, considering the informal procedure under which it is applied, too readily permits censorship of religion by the licensing authorities. *Cantwell* v. *Connecticut,* 310 U. S. 296. The situation here disclosed is not, to reiterate, beyond control on the basis of regulation appropriately directed to the evil.[2]

---

[2] This is the second time that the ordinance which gave rise to Kunz's conviction has been before the Court. That fact is relevant however only for the purpose of appreciating that the context in which and the circumstances under which the Court considered the ordinance the first time are quite different from the conditions underlying the present appeal. The first time the Court had to consider the ordinance was on an appeal from *People* v. *Smith,* 263 N. Y. 255, 188 N. E. 745. In that case the New York Court of Appeals sustained a conviction for expounding atheism in the street without a permit. The appeal to this Court was based solely on the argument that regulation of speakers on religion without regulating other speakers was an unreasonable classification. Responding to this issue, the Court summarily dismissed the appeal, 292 U. S. 606, citing three cases: *Patsone* v. *Pennsylvania,* 232 U. S. 138, 144; *Silver* v. *Silver,* 280 U. S. 117, 123; and *Sproles* v. *Binford,* 286 U. S. 374, 396. All three concern the problem of reasonable classification and in no wise bear on the issue now before us. The difference in the issues between the *Smith* case and the *Kunz* case is strikingly manifested by the fact that the conviction of Smith was affirmed by a unanimous Court of Appeals of New York, whereas in the present case the conviction was affirmed by the narrowest division in that court.

It must also be borne in mind that the *Smith* case was disposed of in 1934, before the series of decisions beginning with *Lovell* v. *Griffin,* 303 U. S. 444, allowing much less scope to local officials in the control of public utterances than had theretofore been taken for granted. Compare the language of *Davis* v. *Massachusetts,* 167 U. S. 43, as well as the atmosphere which it generated. So far as the special circumstances relating to the City of New York are concerned, it is pertinent to note that all three dissenting judges below are residents of New York City, whereas not one of the four constituting

3. Feiner was convicted under New York Penal Law, § 722, which provides:

"Any person who with intent to provoke a breach of the peace, or whereby a breach of the peace may be occasioned, commits any of the following acts shall be deemed to have committed the offense of disorderly conduct:

. . . . .

"2. Acts in such a manner as to annoy, disturb, interfere with, obstruct, or be offensive to others; . . . ."

A State court cannot of course preclude review of due process questions merely by phrasing its opinion in terms of an ultimate standard which in itself satisfies due process. *Watts* v. *Indiana,* 338 U. S. 49, 50; *Baumgartner* v. *United States,* 322 U. S. 665, 670–671; *Norris* v. *Alabama,* 294 U. S. 587, 589–590. Compare *Appleby* v. *City of New York,* 271 U. S. 364, 379–380. But this Court should not re-examine determinations of the State courts on "those matters which are usually termed issues of fact." *Watts* v. *Indiana, supra,* at 50. And it should not overturn a fair appraisal of facts made by State courts in the light of their knowledge of local conditions.

Here, Feiner forced pedestrians to walk in the street by collecting a crowd on the public sidewalk, he attracted additional attention by using sound amplifiers, he indulged in name-calling, he told part of his audience that it should rise up in arms. In the crowd of 75 to 80 persons, there was angry muttering and pushing. Under these circumstances, and in order to prevent a disturbance of the peace, an officer asked Feiner

the majority is a denizen of that City. The three New York City dissenting judges are presumably as alive to the need for securing peace among the various racial and religious groups in New York, and to the opportunity of achieving it within the constitutional limits, as one who has only a visitor's acquaintance with the tolerant and genial communal life of New York City. ˙

to stop speaking. When he had twice ignored the request, Feiner was arrested. The trial judge concluded that "the officers were fully justified in feeling that a situation was developing which could very, very easily result in a serious disorder." His view was sustained by an intermediate appellate court and by a unanimous decision of the New York Court of Appeals. 300 N .Y. 391, 91 N. E. 2d 316. The estimate of a particular local situation thus comes here with the momentum of the weightiest judicial authority of New York.

This Court has often emphasized that in the exercise of our authority over state court decisions the Due Process Clause must not be construed in an abstract and doctrinaire way by disregarding local conditions. In considering the degree of respect to be given findings by the highest court of a State in cases involving the Due Process Clause, the course of decisions by that court should be taken into account. Particularly within the area of due process colloquially called "civil liberties," it is important whether such a course of decisions reflects a cavalier attitude toward civil liberties or real regard for them. Only unfamiliarity with its decisions and the outlook of its judges could generate a notion that the Court of Appeals of New York is inhospitable to claims of civil liberties or is wanting in respect for this Court's decisions in support of them. It is pertinent, therefore, to note that all members of the New York Court accepted the finding that Feiner was stopped not because the listeners or police officers disagreed with his views but because these officers were honestly concerned with preventing a breach of the peace. This unanimity is all the more persuasive since three members of the Court had dissented, only three months earlier, in favor of Kunz, a man whose vituperative utterances must have been highly offensive to them.

As was said in *Hague* v. *C. I. O., supra,* uncontrolled official suppression of the speaker "cannot be made a substi-

tute for the duty to maintain order." 307 U. S. at 516. Where conduct is within the allowable limits of free speech, the police are peace officers for the speaker as well as for his hearers. But the power effectively to preserve order cannot be displaced by giving a speaker complete immunity. Here, there were two police officers present for 20 minutes. They interfered only when they apprehended imminence of violence. It is not a constitutional principle that, in acting to preserve order, the police must proceed against the crowd, whatever its size and temper, and not against the speaker.

It is true that breach-of-peace statutes, like most tools of government, may be misused. Enforcement of these statutes calls for public tolerance and intelligent police administration. These, in the long run, must give substance to whatever this Court may say about free speech. But the possibility of misuse is not alone a sufficient reason to deny New York the power here asserted or so limit it by constitutional construction as to deny its practical exercise.