Abraham Schlissel, J.
By its interim opinion of March 17, 1967 (53 Mise 2d 137) and its order of like date, this court directed a preliminary inquiry into the issues arising from defendant’s reliance upon Yick Wo v. Hopkins (118 U. S. 356) and more recent decisions as barring the instant prosecution.
As the order of March 17, 1967 in part stated, a hearing was then ordered: “as to the legality and constitutionality of the enforcement of the Zoning Ordinances in the City of Long Beach at or about and for the period of 'two years immediately preceding the issuance of the complaint herein.”
The hearing so directed was, as suggested in People v. Utica Daw’s Drug Co. (16 A D 2d 12), held preliminary to rather *894 than as part of the trial proper. This was because, as stated by Mr. Justice Halpern (pp 17-18) in the case last cited: “ The claim of discriminatory enforcement does not go to the question of the guilt or innocence of the defendant, which is within the province of the jury. The question is rather whether in a community in which there is general disregard of a particular law with the acquiescence of the public authorities, the authorities should be allowed sporadically to select a single defendant or a single class of defendants for prosecution because of personal animosity or for some other illegitimate reason * * * The court is asked to stop the prosecution at the threshold, not because the defendant is innocent, but because the public authorities are guilty of a wrong in engaging in a course of conduct designed to discriminate unconstitutionally against the defendant. ’ ’
The probe, authorized and in the court’s judgment mandated by the decision from which it has quoted (as well as by many others, the most recent being Matter of Di Maggio v. Brown (19 N Y 2d 283), was begun on Thursday, March 30, 1967, continued on Friday afternoon, March 31, 1967, and concluded on Monday evening April 3, 1967.
In its conduct of said preliminary hearing the court, believing it to be in the larger public interest that all of the facts be fully developed, and recognizing that “ the burden resting upon the defendant is a heavy one ” (People v. Utica Daw’s, supra; p. 20; Matter of Di Maggio v. Brown, supra), granted her some latitude in the scope of the evidence received by it. However, the court, during said hearing, believed and now continues to believe that all of the evidence accepted by it was properly received and was relevant to and persuasive upon the basic issue, i.e., whether within the tests laid down by the cited cases the constitutional rights of defendant were being invaded.
Before proceeding to an analysis of the testimony thus adduced and a statement of the conclusions (factual and legal) reached by it with respect thereto, the court wishes to express its gratitude to the able and distinguished counsel on both sides of this controversy for the assistance they have given it in resolving what is unquestionably among the most difficult and most volatile issues which it has been called upon to decide. The court also acknowledges its debt to Morris Kravitz, the official reporter, who devoted many hours, both during and outside normal working hours, to taking and transcribing the record herein.
Furthermore the court wishes to acknowledge its recognition of the separation of the functions, powers and responsi *895 Mlities of the Building Commissioner and of the court, and to restate, emphasize and underscore its oft-stated reluctance to interfere (or give the appearance of interfering) with the former’s discharge of the duties which his office and his oath faithfully to perform same impose upon him.
On the other hand, equal recognition must be accorded to this court’s obligation to consider and determine whether, in the light of the evidence (oral and written) received by it at the preliminary hearing, the Building Commissioner is discharging his duties in pursuance of “ a clear, cogent, consistent, constitutional and, above all, nondiscriminatory pattern of enforcement of the zoning laws of this community ”. (Interim Opinion of March 17, 1967; 53 Misc 2d 137,140.)
At the very threshold of its inquiry, the court found itself frustrated by the acknowledged fact that the Building Department of this city maintains no single record (either temporary or permanent), from which it would be possible to quickly ascertain how many inspections were made during any stated period, how many violations were then found and where they were located, how many complaints were received from other sources (such as citizens and interested organizations) during the same period, how many violations (whether uncovered via inspections or civilian complaints) were corrected by voluntary action without prosecution, how many were prosecuted, and why these were and others were not.
Instead, the court was repeatedly told that the Building Department has some 7,500 individual files (presumably one for each building in the city) and that reconstruction thereof to glean therefrom the data above described might require some months of consistent and unrelieved effort.
A brief quotation from the Building Commissioner’s testimony as to this matter would appear justified:
“ Q. Commissioner, is there a record of any kind with respect to how many inspections were made for violations of any of the City ordinances which come within the purview of your department? A. The only way we cah do that is to go into each and every one of the 7500 envelopes, 7500 parcels, to pull out the inspection sheets, if there was one for the year 1965 or 1966. That is the only way I can do it. I don’t keep a list.”
the court : “ I think I asked you this on Friday or Thursday, Commissioner, do you have any records of any kind on which you report complaints that you receive from citizens or organizations ? ”
the witness: “ I answered at that time, I do not, and I don’t, your Honor.”
*896 In view of the foregoing this court has concluded that it cannot give any substantial credence to the Commissioner’s opinion (however sincerely expressed) that prosecutions resulting from inspections outnumbered those having their genesis in civilian or organization complaints by some 3 or 4 to 1. On the contrary, the court finds that no reliable or persuasive basis for this estimate was presented to it.
It is further noted, in this connection, that 5 of the 6 prosecutions whose origin was explored at the hearing admittedly followed civilian complaint (whether individual or organizational).
Furthermore, as suggested in this court’s interim opinion of March 17, 1967 (and as confirmed at the instant hearing), the several prosecutions now pending’, and heretofore directed against the present defendant, had their genesis in the complaints of interested individuals and organizations and did not result from routine inspections.
Additionally, the Building Commissioner acknowledged (while a witness herein) that the partial survey of the canal area undertaken by his department was instituted “ not only on written complaints but also at the direction of the East End Civic Association, block by block”, and that inspectors went into the canal area “ only on a specific complaint ”. In the same fashion does it appear that the survey made “ about two years ago, maybe a little longer; two years approximately”, of the area on the 50 and 100 blocks on the station, east and west side of the railroad between Park Place and the Bay, was undertaken at the request of the Urban Renewal Office and did not result from routine inspections.
Nothing here stated, nor anything properly inferred therefrom, should be understood as suggesting that the instigators of the present prosecution, or the members of the East End Civic Association, or of any other interested organization, should not have the right (vouchsafed every citizen) to petition the public authorities for redress of grievances. On the contrary, as stated in its interim opinion (p. 140), it “recognizes and applauds ” and will insist upon the continuation and expansion of such right.
It does, however, believe that it has both the right and the duty to ascertain “whether there has been and now exists an abdication of the primary responsibility of the public officials charged with the duty to enforce our zoning laws ” (p. 141).
Relevant to, or of at least some significance in the search for the answer to this vital question, is the admitted fact that two of the three partial surveys undertaken by the Building Department (the third being in the West End area) were instigated *897 by complaints from interested individuals and affected organizations (public and private), and only one was undertaken on the department’s own initiative.
The inevitable result of all of the foregoing is, it seems to this court, a form of inadmissible spot-checking rather than pursuant to some “pattern for investigating or checking or inspecting any particular block ”, which the city’s Building Department admittedly does not have.
It is noted that the Commissioner testified that various other methods of zoning law violation detection were employed. However, upon analysis, it seems to the court that the other means of detection described (such as newspaper ads, “For Rent” signs, and “ suspicious construction ”) did not either individually or collectively achieve any significant total of discovery and prosecution.
This court is aware of the fact that the Building Department on the several hearing dates had only three Zoning Inspectors, whose prior experience and work records the Commissioner could not or would not furnish to it, and it notes also that it has since been advised that the department has acquired an additional inspector whose identity, duties and experience have not at this moment been made known to it.
In the court’s judgment, the degree of selectivity of inspection and prosecution which appears to have been here pursued was both unjustified and unjustifiable, nor does it understand why the new inspector above mentioned could not have been brought in earlier, and why still more inspectors cannot be added if and when required.
In this connection, the court rejects as contrary to, and belied by, the record, the implication that the department’s discharge of its duties has been impeded by the court’s failure to expeditiously dispose of filed complaints. On the contrary, the court notes and the record will confirm that at the end of both the calendar years, 1965 and 1966, virtually all pending zoning and kindred prosecutions (other than those stayed by the Supreme Court) had been heard and disposed of by trial or plea and, where guilt was established, by conviction and fine (the amount of which was normally conditioned upon prompt removal of the excess and offending occupants and equipment).
As hereinbefore noted, the court’s problems were further complicated by the admitted absence of a comprehensive record in the Building Department of inspections, findings and dispositions. Instead, it was repeatedly confronted by confession of lack of knowledge as to many basic and elementary matters, *898 all or many stemming from this astounding lack of some reliable and easily consulted compilation.
Typical is the series of responses given as to the results of the partial survey of the canal area over a period of “ about four months, five months ”. Although some 60 houses were then visited and some 20 to 25% of illegal occupancy found, the court was shown evidence of no more than two prosecutions, and was given no acceptable explanation for the failure to institute the 10 to 12 other prosecutions, but was instead told that the reports of these inspections were “probably in the individual files ”, the number of which for the canal area was unknown.
Defendant here complains that during the identical period that the Building Department was unable or unwilling to undertake an area-by-area survey of the entire city to root out and prosecute all violations on a comprehensive and nondiscriminatory basis, it did find the time to institute three prosecutions against her within less than a year. This, she maintains, demonstrates the discriminatory character of the city’s actions and justifies dismissal of the instant charge. For reasons hereinafter stated in detail this court believes that, within the refinement of the Yick Wo doctrine, announced by the Court of Appeals in Di Maggio only a brief month and a half ago, this multiplicity of prosecution, though strange in the light of the total immunity of others, does not warrant the dismissal here sought.
As this court has frequently stated (on many occasions, on the court record) it believes that the administration and functioning of the Building Department have improved during recent years under the leadership of the present Commissioner who has instituted a considerable number of prosecutions. Nevertheless, it also believes that, for the reasons above stated and others not here considered, there remain both room and need for substantial improvement with special emphasis upon the installation and maintenance of adequate records and the promulgation, implementation and expeditious completion of a comprehensive, integrated and all-embracing survey of the entire city, followed by prompt, vigorous and impartial prosecution of all disclosed violations.
It remains then for the court to consider and decide whether its finding (and, indeed, the city’s concession) that “ no general pattern” of zoning law-enforcement exists, coupled with the other findings of fact hereinbefore announced, .justify the conclusion that defendant here is being unconstitutionally prosecuted.
*899 In. this court’s view, the recent decision of the Court of Appeals in Di Maggio v. Brown (supra) bars any such conclusion, and instead requires denial of the instant motion absent a finding (which, upon the present record, it is both unwilling and unable to make) that defendant (upon whom the burden of proof concededly rests People v. Utica Daw’s Drug Co., supra) is the intended victim of ‘ ‘ arbitrary and intentionally unfair discrimination ”, “ clear and intentional discrimination ” or “ invidious discrimination ’ ’.
It seems to the court that essentially defendant has demonstrated little more than “mere nonenforcement of the statute against others similarly situated”. (Burke, J., in Di Maggio, supra, p. 291). She has, of course, made much of the origin of the prosecutions against her and also directed attention to the fact that no less than three prosecutions have been initiated against her in a single year while “ others similarly situated ” have gone unchallenged, unprosecuted and unpunished. She has also pointed out that whereas other prosecutions have been either withheld or stayed on promises of compliance, she has not been given like consideration. These circumstances, while deplorable and deserving of condemnation, (in the last-mentioned instance, at least, because same usurps the court’s function) do not, it seems to this court, sufficiently establish that “invidious”, “arbitrary” or “clear and intentional” discrimination which the Court of Appeals has called an indispensable pre-condition to a finding of unconstitutional enforcement.
In Di Maggio (supra, pp. 290-291) Judge Burke, writing for an unanimous court, noted: “Yick Wo has been interpreted and applied in many instances by both the Supreme Court and other courts, and the test to be used in determining whether there exists a violation of the equal protection clause of the Constitution has been refined to the point of clarity and preciseness.
‘ The unlawful administration by state officers of a state statute fair on its face, resulting in its unequal application to those who are entitled to be treated alike, is not a denial of equal protection unless there is shown to be present in it an element of intentional or purposeful discrimination. This may appear on the face of the action taken with respect to a particular class or person * * * or it may only be shown by extrinsic evidence showing a discriminatory design to favor one individual or class over another not to be inferred from the action itself * * * But a discriminatory purpose is not presumed * * * there *900 must be a showing of “ clear and intentional discrimination ” * *. (Snowden v. Hughes, 321 U. S. 1, 8 [1944]; citations omitted.)
‘ The prohibition of the Equal Protection Clause goes no further than the invidious discrimination. ’ (Williamson v. Lee Opt. Co., 348 U. S. 483, 489 [1955].)
“ And oiie need prove more than mere nonenforcement as against other violators:
‘ [T]he conscious exercise of some selectivity in enforcement is not in itself a federal constitutional violation. Even though the statistics in this case might imply a policy of selective enforcement, it was not stated that the selection was deliberately based upon an unjustifiable standard such as race, religion, or other arbitrary classification. Therefore grounds supporting a finding of a denial of equal protection were not alleged.’ (Oyler v. Boles, 368 U. S. 448, 456 [1962].) ” See, also, Ah Sin v. Wittman, 198 U. S. 500 [1904]; Mackay Tel. Co. v. City of Little Rock, 250 U. S. 94, 100 [1919]; cf. Niemotko v. Maryland, 340 U. S. 268 [1951].; Cox v. Louisiana, 379 U. S. 536, 557 [1965].)
“ Similarly, State and lower Federal courts have uniformly recognized that the doctrine of Yick Wo reaches only intentional or purposeful discrimination. (See Comment, The Right to Nondiscriminatory Enforcement of State Penal Lems, 61 Col. L. Rev. 1103, 1113-1114 n. 48 [1961].) This is the test applied in New York, and it has been strictly interpreted. (People v. Friedman, 302 N. Y. 75 [1950], app. dsmd. 341 U. S. 907 [1951]; People v. Utica Daw’s Drug Co., 16 A D 2d 12 [4th Dept., 1962]; People v. Paine Drug Co., 22 A D 2d 156 [4th Dept., 1964], aftd. 16 NY 2d 503 [1965] cert. den. 382 U. S. 838 [1965]; cf. People v. Walker, 14 N Y 2d 901 [1964].) ”
In the light of the injunction placed upon it by People v. Friedman (supra) to “ strictly interpret” the doctrine of Yick Wo, this court, while unable and unwilling to applaud either the course of action here pursued or the city’s methods of zoning law enforcement, believes that it must, as matter of law, conclude that defendant has flunked her self-imposed assignment and failed to sustain the “ heavy burden ” (People v. Utica Daw’s Drug Co., supra) of proof of that degree of discriminatory action required to justify the implication-loaded finding of uneonstitutiohality.
Accordingly, defendant’s motion to dismiss is denied- and counsel directed to' appear before this court on Tuesday,' June 6, 1967, to fix a trial date.