180 So.2d 114

**Fred L. SHUTTLESWORTH**

**v.**

**CITY OF BIRMINGHAM.**

**6 Div. 979.**

Court of Appeals of Alabama.

Nov. 2, 1965.

Rehearing Denied Dec. 21, 1965.

Arthur D. Shores and Orzell Billingsley, Jr., Birmingham, Jack Greenberg, Norman C. Amaker and Frank H. Heffron, New York City, for appellant.

Wm. C. Walker, Birmingham, for appellee.

CATES, Judge.

This appeal was submitted February 27, 1964, and was originally assigned to JOHNSON, J.

Shuttlesworth was convicted by a jury in a circuit court trial de novo. The City charged him with a breach of its ordinance against parading without a permit. § 1159, General City Code of 1944.[1]

Pursuant to verdict, the trial judge adjudicated him guilty, fined him $75.00 and costs, and also sentenced him to ninety days hard labor for the City.

There are three questions for decision: (1) whether § 1159, supra, denies, on its face, due process of law; (2) whether or not the ordinance as applied violates Yick Wo v. Hopkins, 118 U.S. 356, 6 S.Ct. 1064, 30 L.Ed. 220; and (3) the sufficiency of the evidence.

## I.

## FACTS

About two o'clock, P.M., Good Friday, April 12, 1963, some fifty-two persons issued from a church on Sixth Avenue, North, in Birmingham. They went easterly on the sidewalk of Sixth Avenue crossing Fifteenth and Sixteenth Streets. At Seventeenth Street they turned south, then at Fifth Avenue east again.

The defendant was one of the first to emerge from the church. Various city policemen saw him thereafter, sometimes walking along with and sometimes alongside the others, once bounding from front to rear.

The group went along sometimes two, sometimes three, sometimes four, and at one time a witness saw one rank of six abreast. This observed bunching up coincided with the promenaders being blocked by officers parking police cars athwart the crossing at Fifth Avenue and Eighteenth Street.

There was no evidence that any of the group jaywalked, or that they got into the vehicular roadway except at designated cross walks. Nor did they obstruct cars or pedestrians nor disobey any traffic lights, or officers directing traffic. The only tendency toward showing disorderly conduct lay in evidence that some of the group sang and clapped hands.

The defense adduced no permit for a procession or parade nor was there evidence of anyone applying for a permit. Conversely, the City's proof showed no permit of record for the day in question.

---

1. "It shall be unlawful to organize or hold, or to assist in organizing or holding, or to take part or participate in, any parade or procession or other public demonstration on the streets or other public ways of the city, unless a permit therefor has been secured from the commission.

"To secure such permit, written application shall be made to the commission, setting forth the probable number of persons, vehicles and animals which will be engaged in such parade, procession or other public demonstration, the purpose for which it is to be held or had, and the streets or other public ways over, along or in which it is desired to have or hold such parade, procession or other public demonstration. The commission shall grant a written permit for such parade, procession or other public demonstration, prescribing the streets or other public ways which may be used therefor, unless in its judgment the public welfare, peace, safety, health, decency, good order, morals or convenience require that it be refused. It shall be unlawful to use for such purposes any other streets or public ways than those set out in said permit.

"The two preceding paragraphs, however, shall not apply to funeral processions."

## II.

### BACKGROUND

■ A procession has been described as an assembly in motion. 72 C.J.S., p. 1204, states:

"* * * a group, especially of persons or of vehicles containing persons, moving onward in an orderly, ceremonious, or solemn manner; an orderly file or formation, especially of marchers; a parade."

The essence seems to lie in the group's having ad hoc and pro tempore exclusive possession of all or part of a public way.

Early—probably when in the grip of his fondness for referring to the public as the "Mob"—Holmes, J., in Commonwealth v. Davis, 162 Mass. 510, 39 N.E. 113, 26 L.R. A. 712 spawned what Judge Conway of the New York Court of Appeals characterized as "the plenary power [of public officers] over use of streets and parks." People v. Kunz, 300 N.Y. 273, 90 N.E.2d 455, at 462. Cf. Kunz v. People of State of New York, 340 U.S. 290, 71 S.Ct. 312, 95 L.Ed. 280.

However, though the Davis case was approved in the United States Supreme Court (167 U.S. 43, 17 S.Ct. 731, 42 L.Ed. 71), its assurance has been eroded by later First-Fourteenth Amendment cases beginning with Hague v. Committee for Industrial Organization, 307 U.S. 496, 59 S.Ct. 954, 83 L.Ed. 1423.

Consequently in 1941, we find the court saying in Commonwealth v. Anderson, 308 Mass. 370, 32 N.E.2d 684 (hn. 2), concerning an ordinance of Boston as applied to a Jehovah's Witness:

"* * * there is no suggestion in the agreed facts that the defendant was obstructing traffic, causing danger, or annoying travellers in any way, or that the form of the placards or the writing upon them was indecent, libellous, likely to incite violence or otherwise objectionable. Nor do the terms of the ordinance itself limit its prohibition to instances where these or similar conditions exist. The particular case here presented is one of the unqualified interdiction of a wholly inoffensive display of placards on a public street unless the defendant should submit to the requirement that he first obtain a permit. Whatever result might be reached if the ordinance, by its wording, affected only carefully defined instances of conduct actually inimical to the public interest, or if the proof had disclosed such conduct, we must at least conclude that under decisions by which we are bound the application of this ordinance to this defendant in this instance violated his constitutional right to do what he did without a previous permit from anyone. * * *"

And in the same volume on a consolidated appeal, Commonwealth v. Pascone, 308 Mass. 591, 33 N.E.2d 522, we find the same rule again applied with a precise distinction of ratio decidendi in affirming the second case.

Moreover, in express terms the Massachusetts court, in 1947, comes to grips with the Davis case, supra, Commonwealth v. Gilfedder, 321 Mass. 335, 73 N.E.2d 241 (hn. 3). The opinion confesses puzzlement at how the Supreme Court could speak as it did to its judgment in Hague and yet not have overruled Davis, supra. The Gilfedder opinion by the distinguished Justice (and later Chief Justice) Qua is worthy of close study as a persuasive and considered precedent as to the use of parks by the public.

Hague was decided in 1939. The history of Mayor Hague's resistance to union activity of virtually all sorts cannot be ignored. Nor can that factor be gainsaid in assessing the 5–2 division in the then membership of the court. The opening paragraph, 307 U.S., at 500, 59 S.Ct., at 957, is:

"The judgment of the court in this case is that the decree is modified and as modified affirmed. MR. JUSTICE

FRANKFURTER and MR. JUSTICE DOUGLAS took no part in the consideration or decision of the case. MR. JUSTICE ROBERTS has an opinion in which MR. JUSTICE BLACK concurs, and MR. JUSTICE STONE an opinion in which MR. JUSTICE REED concurs. The CHIEF JUSTICE concurs in an opinion. MR. JUSTICE McREYNOLDS and MR. JUSTICE BUTLER dissent for reasons stated in opinions by them respectively."

Carefully analyzed it is obvious that only Mr. Justice Butler (in dissent) was expressly willing to stand by Davis v. Commonwealth of Massachusetts, 167 U.S. 43, 17 S.Ct. 731.

Roberts, J.,[2] said of Davis [3] (515):

"The ordinance there in question apparently had a different purpose from that of the one here challenged, for it was not directed solely at the exercise of the right of speech and assembly, but was addressed as well to other activities, not in the nature of civil rights, which doubtless might be regulated or prohibited as respects their enjoyment in parks. In the instant case the ordinance deals only with the exercise of the right of assembly for the purpose of communicating views entertained by speakers, and is not a general measure to promote the public convenience in the use of the streets or parks."

After pointing out that the Jersey City ordinance explicitly required permits *only for public parades or assemblies*, he made this oft quoted statement:

" * * * Wherever the title of streets and parks may rest, they have im-

memorially been held in trust for the use of the public and, time out of mind, have been used for purposes of assembly, communicating thoughts between citizens, and discussing public questions. Such use of the streets and public places has, from ancient times, been a part of the privileges, immunities, rights, and liberties of citizens. The privilege of a citizen of the United States to use the streets and parks for communication of views on national questions may be regulated in the interest of all; it is not absolute, but relative, and must be exercised in subordination to the general comfort and convenience, and in consonance with peace and good order; but it must not, in the guise of regulation, be abridged or denied.

"We think the court below was right in holding the ordinance quoted in Note 1 void upon its face. It does not make comfort or convenience in the use of streets or parks the standard of official action. It enables the Director of Safety to refuse a permit on his mere opinion that such refusal will prevent 'riots, disturbances or disorderly assemblage.' It can thus, as the record discloses, be made the instrument of arbitrary suppression of free expression of views on national affairs for the prohibition of all speaking will undoubedly 'prevent' such eventualities. But uncontrolled official suppression of the privilege cannot be made a substitute for the duty to maintain order in connection with the exercise of the right."

At this point we pick up the decisions which follow in the train of the Hague

---

2. The writer suspects that Mr. Justice Roberts in Hague, was chary of "re-examination of constitutional principles" and hence chose to follow the English practice of distinguishing a prior precedent into such narrow confines that its immurement is that of a tomb.

3. The Boston ordinance banned (without a permit from the Mayor) firing cannons, or firearms, hawking goods, setting up shows, etc., as well as public addresses.

case. The early '40's saw the emergence of the Jehovah's Witnesses cases.[4]

In Lovell v. City of Griffin, 303 U.S. 444, 58 S.Ct. 666, 82 L.Ed. 949, the court had held void an ordinance prescribing a permit to distribute literature.

Then after Hague, in 1939, we find: Schneider v. State of New Jersey, 308 U.S. 147, 60 S.Ct. 146, 84 L.Ed. 155 (1939); Carlson v. People of State of California, 310 U.S. 106, 60 S.Ct. 746, 84 L.Ed. 1104 (1940); Jamison v. State of Texas, 318 U.S. 413, 63 S.Ct. 669, 87 L.Ed. 869 (1943); Largent v. State of Texas, 318 U.S. 418, 63 S.Ct. 667, 87 L.Ed. 873 (1943); Jones v. City of Opelika, 319 U.S. 103, 63 S.Ct. 890, 87 L.Ed. 1290 (1943); Murdock v. Commonwealth of Pennsylvania, 319 U.S. 105, 63 S.Ct. 870, 87 L.Ed. 1292 (1943); Saia v. People of State of New York, 334 U.S. 558, 68 S.Ct. 1148, 92 L.Ed. 1574 (1948); Kunz v. People of State of New York, 340 U.S. 290, 71 S.Ct. 312, 95 L.Ed. 280 (1951); Gelling v. State of Texas, 343 U.S. 960, 72 S.Ct. 1002, 96 L.Ed. 1359 (1952); Fowler v. State of Rhode Island, 345 U.S. 67, 73 S.Ct. 526, 97 L.Ed. 828 (1953); and Staub v. City of Baxley, 355 U.S. 313, 78 S.Ct. 277, 2 L.Ed.2d 302 (1958).

Against this array, however, stands Cox v. State of New Hampshire, 312 U.S. 569, 61 S.Ct. 762, 85 L.Ed. 1049, which, unlike the multi-opinion Hague decision, came from an unanimous court speaking through Hughes, C. J. This opinion relied heavily on the State Supreme Court's construction in the same case. State v. Cox, 91 N.H. 137, 16 A.2d 508.

Here, for affirmance, the City of Birmingham claims that Cox is decisive. Concededly, there are many similarities between § 1159 of the Birmingham Code of 1944 and the New Hampshire statute there in question.

Corresponding is the broad sweep of licensing: Thus from Cox, we find: " * * no parade or procession upon any public street or way * * * unless a special license therefor * * *." And of like tenor, § 1159 reads: " * * * unlawful to organize * * * any parade or procession or other public demonstration on the streets or other public ways * * * unless a permit * * *."

Administrative mechanics in each are similar. The New Hampshire Act made no exceptions other than to empower the city licensing committee or board to grant "revocable blanket licenses" to fraternal and other like organizations, to theatres and undertakers.

However, the New Hampshire enactment applied not only to parades and processions but also to performances or exhibits comprising theatrical or dramatic representations as well as any open air public meeting upon any ground abutting on a street or public way.

Moreover, the New Hampshire court, State v. Cox, made no reference to any prior judicial or administrative interpretation of the statute. Whereupon, the court proceeded to fill in by implication a variety of requirements: (1) reasonableness; (2) uniformity of treatment of applications; and (3) freedom from improper or inappropriate considerations and from unfair discrimination.

It was undoubtedly this gloss of "a systematic consistent and just order of treatment" which facilitated affirmance in Cox v. State of New Hampshire, supra.

Since, however, the validity prima facie of § 1159 has not been before any appellate court[5] we find it necessary to examine the unfolding of cases since Cox. In Primm v. City of Birmingham, 42 Ala.App. 657,

---

4. See Harper, Justice Rutledge and the Bright Constellation, 46, et seq.

5. A three-judge court presided over by Rives, J., in King v. City of Birming-

ham (Civil Action 63-196, U.S.D.C., N.D., Alabama, August 12, 1963), dissolved itself without taking up the constitutionality of § 1159.

177 So.2d 326, we found insufficient evidence.

In passing, we note that in McMeans v. Mayor's Court, Fort Deposit, Alabama (M. D., Alabama, September 30, 1965), 247 F. Supp. 606, Frank M. Johnson, J., held an identical ordinance of the City of Fort Deposit to be unconstitutional as applied to the facts.

Nevertheless there are at least two reasons which keep us from using the McMeans opinion as authoritative as to Shuttlesworth's appeal.

*First,* the facts there recited disclose no parade or procession but rather only peaceful picketing within the protection of Thornhill v. State of Alabama, 310 U.S. 88, 60 S.Ct. 736, 84 L.Ed. 1093. Hotel & Restaurant Emp. v. Greenwood, 249 Ala. 265, 30 So.2d 696 (hn. 21).

*Second,* the opinion states that the City appeared but did not seek a remand to its Recorder's Court.

*Third,* we recognize that Judge [Frank M.] Johnson is under the review of, and to that extent is bound by, the decisions of the Fifth Circuit. Indeed, his opinion relies on Rachel v. State of Georgia, 342 F.2d 336, and Peacock v. City of Greenwood, 347 F.2d 679, to justify removal under 28 U.S.C. § 1443.

We understand that Rachel is to be taken up for argument and submission by the Supreme Court of the United States [6] at the current 1965–66 Term, probably in contrast with the Third Circuit's denial of removal in City of Chester v. Anderson, 347 F.2d 823.

### III.

### FIRST AMENDMENT FREEDOMS

The last term of the Supreme Court effectively saw the Fourteenth Amendment incorporate—albeit hesitantly—the first eight amendments to the Federal Constitution as part of the due process laid upon the states. Cf. Black, J., dissenting in Adamson v. People of State of California, 332 U.S. 46, 67 S.Ct. 1672, 91 L.Ed. 1903, with the concurring opinions of Harlan and Goldberg, JJ., in Pointer v. State of Texas, 380 U.S. 400, 85 S.Ct. 1065, 13 L.Ed.2d 923.

The First Amendment reads as follows:

"Congress shall make no law respecting an establishment of religion, or prohibiting the free exercise thereof; or abridging the freedom of speech, or of the press; or the right of the people peaceably to assemble, and to petition the Government for a redress of grievances."

Cardozo, in The Paradoxes of Legal Science, at pages 94–96, says:

"'* * * That ill deserves the name of confinement which hedges us in only from bogs and precipices. So that however it may be mistaken, the end of law is not to abolish or restrain, but to preserve and enlarge freedom. For in all the states of created beings, capable of laws, where there is no law there is no freedom. For liberty is to be free from restraint and violence from others, which cannot be where there is no law; and is not, as we are told, "liberty for every man to do what he lists." For who could be free, when every other man's humour might domineer over him? But a liberty to dispose and order freely as he lists his person, actions, possessions, and his whole property within the allowance of those laws under which he is, and therein not to be subject to the arbitrary will of another, but freely follow his own.' Modern research in social science has amplified the thought of Locke, but without changing its essentials. [Citing Treatises on Civil Government, book 2, sec. 57.]

"'If liberty is a social conception,' says Hobhouse, 'there can be no liberty without social restraint. For any one

---

6. Sub nom. Georgia v. Rachel, 86 S.Ct. 39.

person, indeed, there might be a maximum of liberty if all social restraints were removed. Where physical strength alone prevails the strongest man has unlimited liberty to do what he likes with the weaker; but clearly the greater the freedom of the strong man, the less the freedom of the weaker. What we mean by liberty as a social conception is a right to be shared by all members of society, and very little consideration suffices to show that, in the absence of restraints enforced on or accepted by all members of a society, the liberty of some must involve the oppression of others. * * Excess of liberty contradicts itself. In short there is no such thing; there is only liberty for one and restraint for another.' "

And at pages 97–99 he continues:

"Bills of rights give assurance to the individual of the preservation of his liberty. They do not define the liberty they promise. * * * Liberty became identified with the reign of law. 'Freedom of men under government,' says Locke, 'is to have a standing rule to live by, common to every one of that society and made by the legislative power erected in it.' The individual may not be singled out from among his follows, and made the victim of the shafts of malice. Those who are put over him 'are to govern by promulgated established law, not to be varied in particular cases, but to have one rule for rich and poor, for the favorite at court and the countryman at plough.'

"Up to this, there is no restraint upon the scope or force of law so long as it be law, i. e., so long as it be general or equal, a rule as contrasted with an 'extemporary decree.' Liberty means more than this, however, as a concept of social science. It has come to mean more, at least in our own system, as a concept of constitutional law. The concept in our constitutional development has undergone a steady and highly significant development. The individual may not only insist that the law which limits him in his activities shall impose like limits upon others in like circumstances. He will also be heard to say that there is a domain of free activity that may not be touched by government or law at all, whether the command be special against him or general against him and others. By express provision of the constitution, he is assured freedom of speech and freedom of conscience or religion. These latter immunities have thus the sanctions of a specific pledge, but they are merely phases of a larger immunity which finds expression in the comprehensive declaration that no one shall been deprived of liberty without due process of law. Such at least appears to be the more recent doctrine of the court that speaks the final word. Apart from any enumerated phase of liberty and beyond it, this declaration gives immunity against 'the play and action of purely personal and arbitrary power.' What is personal and arbitrary in mandate and restraint does not gain rationality and coherence because it takes the form of statute. The legislature does not speak with finality as to the measure of its own powers. The final word is for the courts."

Holmes, J., dissenting in Abrams v. United States, 250 U.S. 616, 40 S.Ct. 17, 63 L.Ed. 1173, said:

"Persecution for the expression of opinions seems to me perfectly logical. If you have no doubt of your premises or your power and want a certain result with all your heart you naturally express your wishes in law and sweep away all opposition. To allow opposition by speech seems to indicate that you think the speech impotent, as when a man says that he has squared the circle, or that you do not care whole heartedly for the result, or that you doubt either your power or your prem-

ises. But when men have realized that time has upset many fighting faiths, they may come to believe even more than they believe the very foundations of their own conduct that the ultimate good desired is better reached by free trade in ideas—that the best test of truth is the power of the thought to get itself accepted in the competition of the market, and that truth is the only ground upon which their wishes safely can be carried out. That at any rate is the theory of our Constitution. It is an experiment, as all life is an experiment. Every year if not every day we have to wager our salvation upon some prophecy based upon imperfect knowledge. While that experiment is part of our system I think that we should be eternally vigilant against attempts to check the expression of opinions that we loathe and believe to be fraught with death, unless they so imminently threaten immediate interference with the lawful and pressing purposes of the law that an immediate check is required to save the country. * * * "

From Poulos v. State of New Hampshire, 345 U.S. 395, 73 S.Ct. 760, 97 L.Ed. 1105, per Reed, J., we quote:

"The principles of the First Amendment are not to be treated as a promise that everyone with opinions or beliefs to express may gather around him at any public place and at any time a group for discussion or instruction. It is a nonsequitur to say that First Amendment rights may not be regulated because they hold a preferred position in the hierarchy of the constitutional guarantees of the incidents of freedom. This Court has never so held and indeed has definitely indicated the contrary. It has indicated approval of reasonable nondiscriminatory regulation by governmental authority that preserves peace, order and tranquillity without deprivation of the First Amendment guarantees of free speech, press and the exercise of religion. When considering specifically the regulation of the use of public parks, this Court has taken the same position. See the quotation from the Hague case below and Kunz v. People of State of New York, 340 U.S. 290, 293–294, 71 S.Ct. 312, 314–315, 95 L.Ed. 280; Saia v. People of State of New York, 334 U.S. 558, 562, 68 S.Ct. 1148, 1150, 92 L.Ed. 1574. In these cases, the ordinances were held invalid, not because they regulated the use of the parks for meeting and instruction but because they left complete discretion to refuse the use in the hands of officials. 'The right to be heard is placed in the uncontrolled discretion of the Chief of Police.' 334 U.S. at page 560, 68 S.Ct. [1148] at page 1150, 92 L.Ed. 1574. "[W]e have consistently condemned licensing systems which vest in an administrative officials discretion to grant or withhold a permit upon broad criteria unrelated to proper regulation of public places." 340 U.S. at page 294, 71 S.Ct. [312] at page 315, 95 L.Ed. 280.

"There is no basis for saying that freedom and order are not compatible. That would be a decision of desperation. Regulation and suppression are not the same, either in purpose or result, and courts of justice can tell the difference. * * * "

In Herndon v. Lowry, 301 U.S. 242, 57 S.Ct. 732, 81 L.Ed. 1066 [7] and Freedman v. State of Maryland, 380 U.S. 51, 85 S.Ct. 734, 13 L.Ed.2d 649, the court refers in effect to the preferred position of

7. "The power of a state to abridge freedom of speech and of assembly. is the exception rather than the rule and the penalizing even of utterances of a defined character must find its justification in a reasonable apprehension of danger to organized government. The judgment of the Legislature is not unfettered. The limitation upon individual liberty must have appropriate relation to the safety of the state. * * * "

First Amendment rights of freedom of expression. Thomas v. Collins, 323 U.S. 516, 65 S.Ct. 315, 89 L.Ed. 430. This priority is also used in Hague v. Committee for Industrial Organization, supra. Edwards v. South Carolina, 372 U.S. 229, 83 S.Ct. 680, 9 L.Ed.2d 697, and Cox v. State of Louisiana, 379 U.S. 536, 85 S.Ct. 453, 13 L.Ed.2d 471, are recent examples of this formulation.

In our constitutional law freedom of expression can rarely be fettered by a prior restraint on its exercise. Blackstone, Comm. iv., 151, et seq., aptly said:

"* * * The liberty of the press is indeed essential to the nature of a free state; but this consists in laying no *previous* restraint upon publications, and not in freedom from censure for criminal matter when published. * *"

Moreover, abuse of free speech is tolerated more: the stifling is a worse mischief. Freedman v. State of Maryland, supra.

█ Whether we concede that the appellant did or did not participate in a "procession" or "parade," undisputedly he was arrested while walking on a sidewalk. Immediately beforehand he had participated, from aught that appears, in an orderly and presumably lawful assembly.

█ By merely forbidding citizens to go to (or from) the place of assembly, the right of peaceable assembly could easily be thwarted. Again we note Blackstone, Comm. i, 134:

"* * * This personal liberty consists in the power of locomotion, of changing situation, or moving one's person to whatsoever place one's own inclination may direct, without imprisonment or restraint, unless by due course of law. * * *"

Also, the constitutional protection from unreasonable seizures applies to a seizing of the person. Ex parte Burford, 3 Cranch 448, 2 L.Ed. 495 (1806).

Hence, we consider ourselves bound to examine § 1159, supra, giving preference (1) to the constitutional rights of free expression (e. g., free speech, publication) and of free assembly; and (2) to the implicit right to use the sidewalks for walking.

It is the recognition and regulation of this latter right as being nonexclusive which causes difficulty in legislating and in judicial review of the legislator's choice. This enters into two enquiries: the extent of the power available to regulate and the mode of its exercise.

## IV.

### POLICE POWER

Code 1940, T. 62, § 654, relating solely to Birmingham, provides:

"§ 654. The city shall have full, complete, unlimited, and continuous power and authority, from time to time, to adopt ordinances and regulations not inconsistent with the laws of the state and the federal and state Constitutions to carry into effect or discharge the powers and duties conferred by law upon the city, and to provide for the safety, preserve the health, promote the prosperity, improve the morals, orders, comfort, and convenience of the inhabitants of the city, and to prevent and punish injuries and offenses to the public therein, and to prevent conflict and ill feeling between the races in the city by making provisions for the use of separate blocks or parts of blocks for residences, places of abode, and places of assembly by the different races,[8] and to prevent evasions and punish violations of the ordinances and resolutions of the city, and to compel obedience thereto by fine not exceeding

---

8. City of Birmingham v. Monk, 5 Cir., 185 F.2d 859 (B'ham. zoning ordinance); Buchanan v. Warley, 245 U.S. 60, 38 S.Ct. 16, 62 L.Ed. 149 (1917) (Louisville, Ky.,

ordinance); Harmon v. Tyler, 273 U.S. 668, 47 S.Ct. 471, 71 L.Ed. 831 (1927) (New Orleans ordinance); City of Richmond v. Deans, 281 U.S. 704, 50 S.Ct. 407,

one hundred dollars and by imprisonment or hard labor not exceeding six months, one or both, and by revocation of license granted by such municipality upon conviction in the recorder's court for violation of any of said ordinances; provided, however, that this section shall not be construed to authorize the forfeiture of franchises granted by state laws or city ordinances without appropriate legal proceedings; and to the ends set out in this section the full, complete, and unlimited police powers possessed by the state of Alabama shall be had as though specifically and in detail set out in this section, in so far as it is possible for the legislature of Alabama under the Constitution of Alabama and of the United States to delegate such powers, it being expressly declared that nothing contained herein shall be construed as a limitation of or restriction on the police powers granted to the city under general or special laws."

The general municipal law, Code 1940, T. 37, § 455, reads:

"§ 455. Municipal corporations may, from time to time, adopt ordinances and resolutions not inconsistent with the laws of the state, to carry into effect or discharge the powers and duties conferred by this title, and provide for the safety, preserve the health, promote the prosperity, improve the morals, order, comfort, and convenience of the inhabitants of the municipality, and enforce obedience to such ordinances by fine not exceeding one hundred dollars, and by imprisonment or hard labor not exceeding six months, one or both."

Police power, in 16 Am.Jur.2d, Constitutional Law, § 262, is described (in part) thus:

"While it is generally recognized that it is very difficult and practically impossible to give an exact definition of the police power, many attempts have been made. There is no consensus in favor of any of them, but these definitions are of considerable value as indicating the breadth and scope of this power.

"The expression 'police power,' although capable of use, and sometimes used, in a restricted sense, is frequently used very broadly to include all legislation and almost every function of civil government. Thus, it has been stated that the police power in effect sums up the whole power of government, and that all other powers are only incidental and ancillary to the execution of the police power; it is that full, final power involved in the administration of law as the means to the attainment of practical justice. And it has been said that the power is only another name for that authority which resides in every sovereignty to pass all laws for the internal regulation and government of the state, that it is the vast residual power of the state, and that it comprises that portion of the sovereignty of the state which is not surrendered by the terms of the Federal Constitution to the federal government.

"Blackstone defines police power as 'the due regulation and domestic order of the kingdom, whereby the individuals of the state, like members of a well-governed family, are bound to conform their general behavior to the rules of propriety, good neighborhood, and good manners, and to be decent, industrious, and inoffensive in their respective stations. Many cases, employing the language of Chief Justice Shaw, define it as 'the power vested in the legislature by the Constitution to make, ordain, and establish all manner of wholesome and reasonable laws, statutes, and ordinances, either with penalties or without,

74 L.Ed. 1128 (1930) (Richmond Va., ordinance). See also Robinson v. State of

Florida, 375 U.S. 918, 84 S.Ct. 262, 11 L.Ed.2d 163.

not repugnant to the Constitution, as they shall judge to be for the good and welfare of the commonwealth, and of the subjects of the same.' "

Knight, J., in State v. Kartus, 230 Ala. 352, 162 So. 533, 101 A.L.R. 1336, said:

"No one, at this time, we take it, would have the temerity to undertake to define the 'police power' of a state, or mark its limitations. * * *"

In Hawkins v. City of Birmingham, 248 Ala. 692, 29 So.2d 281, Foster, J., said of T. 62, § 654, supra (at p. 696, 29 So.2d at p. 283): "This power is of course subject to be controlled." See also City of Birmingham v. Birmingham Business College, Inc., 256 Ala. 551, 56 So.2d 111.

■ Concededly, if the Legislature confers the charter power, a city or town may ordain regulations for the use of its streets and sidewalks. This power cannot, however, extend beyond constitutional bounds.

■ We are presented with two conflicting concepts. *First,* the use of public ways is subject primarily to going to and fro of the public generally, afoot on sidewalks, with the roadway mainly reserved for wheeled traffic.[9]

■ *Secondly,* free speech, the communication of ideas, and free assembly, locomotion, inhere in the use of public places.

At the outset, we believe that the early case of Commonwealth v. Davis, supra, treating public property as subject to power to be used exclusively in the will of public authorities as if they were private owners is no longer valid. Thomas v. Casey, 121 N.J.L. 185, 1 A.2d 866, rested on Davis.

Hague v. Committee for Industrial Organization, supra, disapproved.

Police power [10] has been held vital for society to hold together: the contrast often is given of anarchy, and not the philosophic nirvana-like anarchy. Law and order for the protection of the weak from the strong is in contrast to the law of the jungle.

Emergencies, however, do not create powers: rather they furnish the occasion for the exercise of those conferred. Constitutional law cannot raise itself by its own bootstraps. Homebuilding & Loan Ass'n v. Blaisdell, 290 U.S. 398, 54 S.Ct. 231, 78 L. Ed. 413.

■ We do not doubt that § 654 of T. 62 and § 455 of T. 37, supra, confer on the city the power to regulate the use of public streets and places in the interest of accommodating conflicting claims of vehicles and pedestrians. Yet, in so resolving traffic problems the State and Federal Constitutions impose a duty to recognize liberty within a concept of an ordered society.

■ Basically, we consider that a municipality or a state legislature can require that a permit be first obtained to use the vehicular portion of a street for a parade or procession. Moreover, if the movement overflows onto the pedestrian sidewalk the same ends for control would seem to obtain.

■ As to a group walking on the sidewalk of a dedicated street, spaced apart, not blocking others from going to or fro, nor interfering with cross traffic (either pedestrian or vehicular) and demeaning themselves in an orderly and peaceable fashion, we consider there is such a fundamental right to so use the sidewalk that a permit would be the exception. Thus, the

9. "[A]ny person engaged in a lawful pursuit has the right to pass on the public streets without interference, threats or intimidation." Russell v. International Union, etc., 258 Ala. 615, 64 So.2d 384. Nor is a pedestrian vis a vis a street railway running at grade to be deemed a trespasser. Birmingham, Ensley, etc.,

R. R. Co. v. Stagg, 196 Ala. 612, 72 So. 164.

10. Jacobson v. Commonwealth of Massachusetts, 197 U.S. 11, 25 S.Ct. 358, 49 L. Ed. 643 (smallpox vaccination); Lieberman v. Van de Carr, 199 U.S. 552, 26 S.Ct. 144, 50 L.Ed. 305 (milk delivery permit).

City in such a case would have the burden of proving (beyond a reasonable doubt) that (1) no permit was issued and that (2) an abridgement of the rights (either of expression or of locomotion) is warranted by overriding considerations.

Picketing, as currently regulated by spacing the picketers (both as to fore and aft and abreast), keeping them circulating and yielding the right of way to passers-by, affords a useful illustration.

■ Ordinarily, a court in reviewing legislation will look at the remedy with the favoring intendment that all rationally connected mischiefs passed through the collective mind of the lawmakers. Thus the inhibition of conduct—though sometimes partly innocent—can find support in the state's police power if aimed at a substantial evil.

Nevertheless, this balancing in First Amendment cases finds the scales weighted in the beginning in favor of the freedom which is sought to be restrained. As Rutledge, J., said in Thomas v. Collins, supra, 323 U.S. at 529–530, 65 S.Ct., at 322–323:

"The case confronts us again with the duty our system places on this Court to say where the individual's freedom ends and the State's power begins. Choice on that border, now as always delicate, is perhaps more so where the usual presumption supporting legislation is balanced by the preferred place given in our scheme to the great, the indispensable democratic freedoms secured by the First Amendment. Cf. Schneider v. State of New Jersey, 308 U.S. 147, 60 S.Ct. 146, 84 L.Ed. 155; Cantwell v. [State of] Connecticut, 310 U.S. 296, 60 S.Ct. 900, 84 L.Ed. 1213; Prince v. [Commonwealth of] Massachusetts, 321 U.S. 158, 64 S.Ct. 438 [88 L.Ed. 645]. That priority gives these liberties a sanctity and a sanction not permitting dubious intrusions. And it is the character of the right, not of the limitation, which determines what standard governs the choice. Compare United States v. Carolene Products Co., 304 U.S. 144, 152, 153, 58 S.Ct. 778, 783, 784, 82 L.Ed. 1234.

"For these reasons any attempt to restrict those liberties must be justified by clear public interest, threatened not doubtfully or remotely, but by clear and present danger. The rational connection between the remedy provided and the evil to be curbed, which in other contexts might support legislation against attack on due process grounds, will not suffice. These rights rest on firmer foundation. Accordingly, whatever occasion would restrain orderly discussion and persuasion, at appropriate time and place, must have clear support in public danger, actual or impending. Only the gravest abuses, endangering paramount interests, give occasion for permissible limitation. It is therefore in our tradition to allow the widest room for discussion, the narrowest range for its restriction, particularly when this right is exercised in conjunction with peaceable assembly. It was not by accident or coincidence that the rights to freedom in speech and press were coupled in a single guaranty with the rights of the people peaceably to assemble and to petition for redress of grievances. All these, though not identical, are inseparable. They are cognate rights, cf. De Jonge v. [State of] Oregon, 299 U.S. 353, 364, 57 S.Ct. 255, 259, 81 L.Ed. 278, and therefore are united in the First Article's assurance. * * *"

We conclude that the reference in § 1159 to the factors ("public welfare, peace, safety, health, decency, good order, morals or convenience") are but facets of the police power conferred on the City to enable it to establish and maintain itself as a viable entity. These elements are only the source to which the City may look in choosing the means toward a legitimate end. Police power is not an ever ready deus ex machina.

The enquiry next devolves on whether the City's legislative body has established

an appropriate means to prevent abuses in the streets.

## V.

## DOES § 1159 IMPOSE AN INVIDIOUS PRIOR RESTRAINT?

█ This question we must answer in the affirmative.

In Saia v. People of State of New York, 334 U.S. 558, 68 S.Ct. 1148, the court declared a sound truck permit ordinance void on its face.

Niemotko v. State of Maryland, 340 U.S. 268, 71 S.Ct. 325, 328, 95 L.Ed. 267:

"This Court has many times examined the licensing systems by which local bodies regulate the use of their parks and public places. * * * In those cases this Court condemned statutes and ordinances which required that permits be obtained from local officials as a prerequisite to the use of public places, on the grounds that a license requirement constituted a prior restraint on freedom of speech, press and religion, *and, in the absence of narrowly drawn, reasonable and definite standards for the officials to follow, must be invalid.* * * *" (Italics added.)

Kunz v. People of State of New York, 340 U.S. 290, 71 S.Ct. 312:

" * * * We have here, then, an ordinance which gives an administrative official discretionary power to control in advance the right of citizens to speak on religious matters on the streets of New York. As such, the ordinance is clearly invalid as a prior restraint on the exercise of First Amendment rights.

"In considering the right of a municipality to control the use of public streets for the expression of religious views, we start with the words of Mr. Justice Roberts that 'Wherever the title of streets and parks may rest, they have immemorially been held in trust for the use of the public and, time out of mind,

have been used for purposes of assembly, communicating thoughts between citizens, and discussing public questions.' Hague v. C. I. O., 1939, 307 U.S. 496, 515, 59 S.Ct. 954, 964, 83 L. Ed. 1423. Although this Court has recognized that a statute may be enacted which prevents serious interference with normal usage of streets and parks. Cox v. State of New Hampshire, 1941, 312 U.S. 569, 61 S.Ct. 762, 85 L.Ed. 1049, we have consistently condemned licensing systems which vest in an administrative official discretion to grant or withhold a permit upon broad criteria unrelated to proper regulation of public places. * * * *"

American Civil Liberties Union v. Town of Cortlandt, Sup., 109 N.Y.S.2d 165:

"Although in most cases where legislative acts have been struck down, the discretion in administering the licensing power has been placed in administrative official, the rule is no different where the legislative body reserves for itself the administration of the licensing power. In the case of Niemotko v. [State of] Maryland, 340 U.S. 268, 71 S.Ct. 325, 328, 95 L.Ed. 267, 280, applications for a license were customarily made first to the Police Commissioner, and, if refused by him, application was then made to the City Council. Even that body was not permitted to have unlimited and uncircumscribed discretion. It is that type of discretion that has been here vested and, of necessity, this Court must declare the 'Permit Ordinance' unconstitutional."

Cox v. State of Louisiana, supra:

"This Court has recognized that the lodging of such broad discretion in a public official allows him to determine which expressions of view will be permitted and which will not. This thus sanctions a device for the suppression of the communication of ideas and permits the official to act as a censor. See Saia v. People of State of New

York, supra, 334 U.S. at 562, 68 S.Ct. [1148] at 1150. Also inherent in such a system allowing parades or meetings only with the prior permission of an official is the obvious danger to the right of a person or group not to be denied equal protection of the laws. See Niemotko v. State of Maryland, supra, 340 U.S. at 272, 284, 71 S.Ct. [325], at 327, 333; cf. Yick Wo v. Hopkins, 118 U.S. 356, 6 S. Ct. 1064, 30 L.Ed. 1020. It is clearly unconstitutional to enable a public official to determine which expressions of view will be permitted and which will not or to engage in invidious discrimination among persons or groups either by use of a statute providing a system of broad discretionary licensing power or, as in this case, the equivalent of such a system by selective enforcement of an extremely broad prohibitory statute.

"It is, of course, undisputed that appropriate, limited discretion, under properly drawn statutes or ordinances, concerning the time, place, duration, or manner of use of the streets for public assemblies may be vested in administrative officials, provided that such limited discretion is 'exercised with "uniformity of method of treatment upon the facts of each application, free from improper or inappropriate considerations and from unfair discrimination" * * * [and with] a "systematic, consistent and just order of treatment, with reference to the convenience of public use of the highways * * *."' Cox v. State of New Hampshire, supra, 312 U.S. at 576, 61 S.Ct. [762], at 766. See Poulos v. State of New Hampshire, supra.

"But here it is clear that the practice in Baton Rouge allowing unfettered discretion in local officials in the regulation of the use of the streets for peaceful parades and meetings is an unwarranted abridgment of appellant's freedom of speech and assembly secured to him by the First Amendment,

as applied to the States by the Fourteenth Amendment. It follows, therefore, that appellant's conviction for violating the statute as so applied and enforced must be reversed."

The only administrative standards are those of the City's basic power virtually in its entirety. The expressions used are couched in the distributive. Hence, a single reference to the Commission's opinion of the public welfare, or of peace, or of safety, or of health, or of decency, or of good order, or of morals, or of convenience would suffice for a permit refusal.

"* * * [The police power of a state] must be exercised for an end which is in fact public and the means adopted must be reasonably adapted to the accomplishment of that end and must not be arbitrary or oppressive."—Treigle v. Acme Homestead Ass'n, 297 U.S. 189, 56 S.Ct. 408, 80 L.Ed. 575.

VI.

§ 1159 LACKS ASCERTAINABLE STANDARDS

■ If the cohesiveness of the fifty-two pedestrians in having a common starting point and apparent common destination were held to constitute a procession, nevertheless we should be constrained to hold the foregoing ordinance invalid for the lack of ascertainable constitutional standards in determining administratively when a permit shall be granted. Baines v. City of Danville, 4 Cir., 337 F.2d 579.

So far as we can find, § 1159 has been reviewed directly only once by appellate courts. In Primm v. City of Birmingham, supra, we held the City had singled out the defendant without showing any nexus between him and any other pedestrians. There, Johnson, J., said:

"To hold that the acts of * * * Primm were violative of the above parading ordinance would, in effect, require a parading permit to be procured by every conventioneer wearing a

large political button attempting to cross a street, or by every sporting enthusiast waving a pennant that denotes his loyalties while proceeding to the field of encounter. * * *"

In Baines v. City of Danville, supra, approving reference is made to the Model Ordinance Regulating Parades drafted by the National Institute of Municipal Law Officers.

Hence, we have set out in parallel columns an analysis of the salient features of § 1159 and the NIMLO Model:

BIRMINGHAM 1944 CODE, § 1159, 2d Par., supra.

I. Form of Application

 A. Written

 B. Information

 1. No. of persons, vehicles and animals

 2. Purpose

 3. Route (or place of demonstration).

 4. Time not required to be given.

NIMLO MODEL

I. (§ 10–304

 A. On forms provided by Chief of Police

 B. Information

"(a) The name, address and telephone number of the person seeking to conduct such parade;

"(b) If the parade is proposed to be conducted for, on behalf of, or by an organization, the name, address and telephone number of the headquarters of the organization, and of the authorized and responsible heads of such organization;

"(c) The name, address and telephone number of the person who will be the parade chairman and who will be responsible for its conduct;

"(d) The date when the parade is to be conducted;

"(e) The route to be traveled, the starting point and the termination point;

"(f) The approximate number of persons who, and animals and vehicles which, will constitute such parade; the type of animals, and description of the vehicles;

"(g) The hours when such parade will start and terminate;

"(h) A statement as to whether the parade will occupy all or only a portion of the width of the streets proposed to be traversed;

"(i) The location by streets of any assembly areas for such parade;

"(j) The time at which units of the parade will begin to assemble at any such assembly area or areas;

BIRMINGHAM 1944 CODE,
§ 1159, 2d Par., supra.

NIMLO MODEL

"(k) The interval of space to be maintained between units of such parade;

"(l) If the parade is designed to be held by, and on behalf of or for, any person other than the applicant, the applicant for such permit shall file with the Chief of Police a communication · in writing from the person proposing to hold the parade, authorizing the applicant to apply for the permit on his behalf.

"(m) Any additional information which the Chief of Police shall find reasonably necessary to a fair determination as to whether a permit should issue.

C. Late application: _____ days before proposed parade.

D. Fee: $_____

II. Exceptions (§ 10–303

A. Funeral processions.

B. Students going to and from classes, etc.

C. A governmental agency acting within scope.

III. Standards (§ 10–305

"SECTION 10–305. *Standards for Issuance.* The Chief of Police shall issue a permit as provided for hereunder when, from a consideration of the application and from such other information as may otherwise be obtained, he finds that:

"(1) The conduct of the parade will not substantially interrupt the safe and orderly movement of other traffic contiguous to its route;

"(2) The conduct of the parade will not require the diversion of so great a number of police officers of the City to properly police the line of movement and the areas contiguous thereto as to prevent normal police protection to the City;

II. Exceptions

A. Funeral processions only exception.

III. Standards for Issuance

A. "The commission shall grant * * * and prescribing the streets [11] * * * unless in its judgment:" the permit should be refused because of any one or more of the following:

1. Public welfare;
2. [Public] peace;
3. [Public] safety;
4. [Public] health;
5. [Public] decency;
6. [Public] good order;
7. [Public] morals; or
8. [Public] convenience.

11. § 10–308 of NIMLO Model empowers the Chief of Police to issue an alternate

permit, i. e., for a different time or route from that proposed.

BIRMINGHAM 1944 CODE,
§ 1159, 2d Par., supra.

NIMLO MODEL

"(3) The conduct of such parade will not require the diversion of so great a number of ambulances as to prevent normal ambulance service to portions of the City other than that to be occupied by the proposed line of march and areas contiguous thereto;

"(4) The concentration of persons, animals and vehicles at assembly points of the parade will not unduly interfere with proper fire and police protection of, or ambulance service to, areas contiguous to such assembly areas;

"(5) The conduct of such parade will not interfere with the movement of fire-fighting equipment enroute to a fire;

"(6) The conduct of the parade is not reasonably likely to cause injury to persons or property, to provoke disorderly conduct or create a disturbance;

"(7) The parade is scheduled to move from its point of origin to its point of termination expeditiously and without unreasonable delays enroute;

"(8) The parade is not to be held for the sole purpose of advertising any product, goods or event, and is not designed to be held purely for private profit."

IV. Appeal Procedure:

None, except to courts, presumably by way of mandamus with alternative prayer for certiorari.

IV. Appeal Procedure: (§ 10–307

"SECTION 10–307. Appeal Procedure. Any person aggrieved shall have the right to appeal the denial of a parade permit to the City Council. The appeal shall be taken within . . . days after notice. The City Council shall act upon the appeal within . . . . . . days after its receipt."

———◆———

A keystone illustration of the canon of strict (or at least literal) construction of a penal law is found in McBoyle v. United States, 283 U.S. 25, at 27, 51 S.Ct. 340, 75 L.Ed. 816. There the government tried to apply the Dyer Act to punish theft of an airplane. Holmes, J., concluded:

"Although it is not likely that a criminal will carefully consider the text of

the law before he murders or steals, it is reasonable that a fair warning should be given to the world in language that the common world will understand, of what the law intends to do if a certain line is passed. To make the warning fair, so far as possible the line should be clear. When a rule of conduct is laid down in words that evoke in the

common mind only the picture of vehicles moving on land, the statute should not be extended to aircraft simply because it may seem to us that a similar policy applies, or upon the speculation that if the legislature had thought of it, very likely broader words would have been used. United States v. Bhagat Singh Thind, 261 U.S. 204, 209, 43 S.Ct. 338, 67 L.Ed. 616."

And from a Massachusetts case we quote:

" * * * Prima facie, mere sauntering or loitering on a public way is lawful and the right of any man, woman, or child. This the Commonwealth concedes. Under the ordinance, such conduct continues conditionally lawful subject to a direction to move on by a police officer followed by unreasonable failure to comply and the expiration of seven minutes. Not all idling is prohibited, but only that which is unreasonable. The vice of the ordinance lies in its failure to prescribe any standard capable of intelligent human evaluation to enable one chargeable with its violation to discover those conditions which convert conduct which is prima facie lawful into that which is criminal. A 'statute which either forbids or requires the doing of an act in terms so vague that men of common intelligence must necessarily guess at its meaning and differ as to its application, violates the first essential of due process of law.' Connally v. General Construction Co., 269 U.S. 385, 391, 46 S.Ct. 126, 127, 70 L.Ed. 322 * * *"—Commonwealth v. Carpenter, 325 Mass. 519, 91 N.E.2d 666.

Connally v. General Const. Co., 269 U.S. 385, 46 S.Ct. 126, is probably the most frequently cited case in this area:

" * * * The result is that the application of the law depends, not upon a word of fixed meaning in itself, or one made definite by statutory or ju-

dicial definition, or by the context or other legitimate aid to its construction, but upon the probably varying impressions of juries as to whether given areas are or are not to be included within particular localities. The constitutional guaranty of due process cannot be allowed to rest upon a support so equivocal."

In United States v. Cardiff, 344 U.S. 174, 73 S.Ct. 189, 97 L.Ed. 200, Douglas, J., said:

"All that the Department says may be true. But it does not enable us to make sense out of the statute. Nowhere does the Act say that a factory manager must allow entry and inspection at a reasonable hour. Section 704 makes entry and inspection conditioned on 'making request and obtaining permission'. It is that entry and inspection which § 301(f) backs with a sanction. It would seem therefore on the face of the statute that the Act prohibits the refusal to permit inspection only if permission has been previously granted. Under that view the Act makes illegal the revocation of permission once given, not the failure to give permission. But that view would breed a host of problems. Would revocation of permission once given carry the criminal penalty no matter how long ago it was granted and no matter if it had no relation to the inspection demanded? Or must the permission granted and revoked relate to the demand for inspection on which the prosecution is based? Those uncertainties make that construction pregnant with danger for the regulated business. The alternative construction pressed on us is equally treacherous because it gives conflicting commands. It makes inspection dependent on consent and makes refusal to allow inspection a crime. However we read § 301 (f) we think it is not fair warning, cf. United States v. Weitzel, 246 U.S. 533, 38 S.Ct. 381, 62 L.Ed. 872; McBoyle

v. United States, 283 U.S. 25, 51 S.Ct. 340, 75 L.Ed. 816, to the factory manager that if he fails to give consent, he is a criminal. The vice of vagueness in criminal statutes is the treachery they conceal either in determining what persons are included or what acts are prohibited. Words which are vague and fluid, cf. United States v. L. Cohen Grocery Co., 255 U.S. 81, 41 S.Ct. 298, 65 L.Ed. 516, may be as much of a trap for the innocent as the ancient laws of Caligula. We cannot sanction taking a man by the heels for refusing to grant the permission which this Act on its face apparently gave him the right to withhold. That would be making an act criminal without fair and effective notice. Cf. Herndon v. Lowry, 301 U.S. 242, 57 S.Ct. 732, 81 L.Ed. 1066."

This general rule of strict construction of penal laws began early in our courts, both state and Federal. Thus, Washington, J., in United States v. Sharp (1815), 27 Fed.Cas. p. 1041, No. 16, 264 Pet.C.C. 118, at 122, said:

"* * * Laws which create crimes ought to be so explicit in themselves or by reference to some other standard, that all men subject to their penalties may know what acts it is their duty to avoid. * * *"

See also United States v. Lacher, 134 U.S. 624, 10 S.Ct. 625, 33 L.Ed. 1080; United States v. Brewer, 139 U.S. 278, 11 S.Ct. 538, 35 L.Ed. 190; cf. Nash v. United States, 229 U.S. 373, 33 S.Ct. 780, 57 L.Ed. 1232— "restraint of trade" has an ascertainable common law meaning. Eubank v. City of Richmond, 226 U.S. 137, 33 S.Ct. 76, 57 L.Ed. 156; Panhandle Eastern Pipe Line Co. v. State Highway Comm., 294 U.S. 613, 55 S.Ct. 563, 79 L.Ed. 1090.

By 1914 we find the court subsuming the rule into its concept of due process and under the Fourteenth Amendment rather than the Sixth. International Harvester Co. v. Commonwealth of Kentucky, 234 U.S. 216, 34 S.Ct. 853, 58 L.Ed. 1284, struck down a state anti-trust law which used "real value." Cf. Kentucky Constitution 1891, § 198.

In Winters v. People of State of New York, 333 U.S. 507, 68 S.Ct. 665, 92 L.Ed. 840, Reed, J., said:

"* * * The standards of certainty in statutes punishing for offenses is higher than in those depending primarily upon civil sanction for enforcement. The crime 'must be defined with appropriate definiteness.' Cantwell v. State of Connecticut, 310 U.S. 296, 60 S.Ct. 900, 84, L.Ed. 1213; Pierce v. United States, 314 U.S. 306, 311, 62 S.Ct. 237, 239, 86 L.Ed. 226. * * *

* * * * * *

"The impossibility of defining the precise line between permissible uncertainty in statutes caused by describing crimes by words well understood through long use in the criminal law —obscene, lewd, lascivious, filthy, indecent or disgusting—and the unconstitutional vagueness that leaves a person uncertain as to the kind of prohibited conduct—massing stories to incite crime—has resulted in three arguments of this case in this Court. The legislative bodies in draftsmanship obviously have the same difficulty as do the judicial in interpretation. * * *

"* * * But even considering the gloss put upon the literal meaning by the Court of Appeals' restriction of the statute to collections of stories 'so massed as to become vehicles for inciting violent and depraved crimes against the person * * * not necessarily * * sexual passion,' we find the specification of publications, prohibited from distribution, too uncertain and indefinite to justify the conviction of this petitioner. Even though all detective tales and treatises on criminology are not forbidden, and though publications made up of criminal deeds not characterized by bloodshed or lust are omitted

from the interpretation of the Court of Appeals, we think fair use of collections of pictures and stories would be interdicted because of the utter impossibility of the actor or the trier to know where this new standard of guilt would draw the line between the allowable and the forbidden publications. No intent or purpose is required—no indecency or obscenity in any sense heretofore known to the law. 'So massed as to incite to crime' can become meaningful only by concrete instances. This one example is not enough. The clause proposes to punish the printing and circulation of publications that courts or juries may think influence generally persons to commit crime of violence against the person. No conspiracy to commit a crime is required. See Musser v. State of Utah [333 U.S. 95], 68 S.Ct. 397 [92 L.Ed. 562], this Term. It is not an effective notice of new crime. The clause has no technical or common law meaning. Nor can light as to the meaning be gained from the section as a whole or the Article of the Penal Law under which it appears. * * *

* * * * * *
" * * * Where a statute is so vague as to make criminal an innocent act, a conviction under it cannot be sustained. Herndon v. Lowry, 301 U.S. 242, 259, 57 S.Ct. 732, 739, 81 L.Ed. 1066."

In the "Miracle" censorship case, Joseph Burstyn, Inc. v. Wilson, 343 U.S. 495, 72 S.Ct. 777, 96 L.Ed. 1098, the word "sacrilegious" (contrasted with "blasphemous") was held to be fatally vague. Clark, J., there said:

" * * * That statute makes it unlawful 'to exhibit, or to sell, lease or lend for exhibition at any place of amusement for pay or in connection with any business in the state of New York, any motion picture film or reel [with specified exceptions not relevant here], unless there is at the time in full force and effect a valid license or permit therefor of the education department * * *.' The statute further provides:

" 'The director of the [motion picture] division [of the education department] or, when authorized by the regents, the officers of a local office or bureau shall cause to be promptly examined every motion picture film submitted to them as herein required, and unless such film or a part thereof is obscene, indecent, immoral, inhuman, sacrilegious, or is of such a character that its exhibition would tend to corrupt morals or incite to crime, shall issue a license therefor. * * *

* * * * * *
" * * * Under such a standard the most careful and tolerant censor would find it virtually impossible to avoid favoring one religion over another, and he would be subject to an inevitable tendency to ban the expression of unpopular sentiments sacred to a religious minority. Application of the 'sacrilegious' test, in these or other respects, might raise substantial questions under the First Amendment's guaranty of separate church and state with freedom of worship for all. However, from the standpoint of freedom of speech and the press, it is enough to point out that the state has no legitimate interest in protecting any or all religions from views distasteful to them which is sufficient to justify prior restraints upon the expression of those views. It is not the business of government in our nation to suppress real or imagined attacks upon a particular religious doctrine, whether they appear in publications, speeches, or motion pictures.

"Since the term 'sacrilegious' is the sole standard under attack here, it is not necessary for us to decide, for example, whether a state may censor motion pictures under a clearly drawn statute designed and applied to prevent

the showing of obscene films. That is a very different question from the one now before us. We hold only that under the First and Fourteenth Amendments a state may not ban a film on the basis of a censor's conclusion that it is 'sacrilegious.'"

Reference may also be had to the following articles: Amsterdam, The Void-for-Vagueness Doctrine, 109 U.Pa.L.Rev. 67; Aigler, Legislation in Vague or General Terms, 21 Mich.L.Rev. 831; Freund, Use of Indefinite Terms in Statutes, 30 Yale L.J. 437; Hall, Strict or Liberal Construction of Penal Statutes, 48 H.L.Rev. 748; Hall and Seligman, Mistake of Law and Mens Rea, 8 U.Chi.L.Rev. 641; Note, Statutory Standards of Personal Conduct: Indefiniteness and Uncertainty as Violations of Due Process, 38 H.L.Rev. 963; Note, Indefinite Criteria of Definiteness in Statutes, 45 H.L.Rev. 160; Note, Void for Vagueness: An Escape from Statutory Interpretation, 23 Ind.L.J. 272; Horack, Constitutional Liberties and Statutory Construction, 29 Iowa L.Rev. 448; Quarles, Some Statutory Construction Problems and Approaches in Criminal Law, 3 Vand.L.Rev. 531; Morris, Case Note, 26 Tex.L.Rev. 216 and Case Note, 33 Va.L.Rev. 203.

Nor is this principle a stranger to our jurisprudence. Carter v. State, 243 Ala. 575, 11 So.2d 764; Kahalley v. State, 254 Ala. 482, 48 So.2d 794.

Mr. Justice Simpson well stated the rule in Bolin v. State, 266 Ala. 256, 96 So.2d 582, where the court on certified question held the stink bomb law void for vagueness. There we find:

"If the provision can be sustained as constitutional it must be under the police power of the state which authorizes the imposition of reasonable regulations in the interest of public health, public morals, public safety or the general welfare. Looking to one of the earliest authorities, Blackstone defines this power to be 'the due regulation and domestic order of the king-dom: whereby the individuals of the State, like members of a well governed family, are bound to conform their general behavior to the rules of propriety, good neighborhood, and good manners; and to be decent, industrious and inoffensive in their respective stations.' 4 Blackstone Commentaries 162.

"Mr. Justice Holmes, speaking for the Supreme Court of the United States in Noble State Bank v. Haskell, 219 U.S. 104, 111, 31 S.Ct. 186, 188, 55 L.Ed. 112, observed:

"'It may be said in a general way that the police power extends to all the great public needs. Camfield v. United States, 167 U.S. 518, 17 S.Ct. 864, 42 L.Ed. 260. It may be put forth in aid of what is sanctioned by usage, or held by the prevailing morality or strong and preponderant opinion to be greatly and immediately necessary to the public welfare.'

\*　\*　\*　\*　\*　\*

"It is also settled law that 'In enacting a criminal statute, there is an obligation on the State to so frame it that those who are to administer it and those to whom it is to be administered may know what standard of conduct is intended to be required and legislation may run afoul of the due process clause because of a failure to set up any sufficient guidance to those who would be law-abiding, or to advise a defendant of the nature and cause of an accusation he is called on to answer, or to guide the courts in the law's enforcement.' Kahalley v. State, 254 Ala. 482, 483, 48 So.2d 794, 795; Seals v. State, 239 Ala. 5, 194 So. 682; Standard Oil Co. v. State, 178 Ala. 400, 59 So. 667; Carter v. State, 243 Ala. 575, 11 So.2d 764.

"And a person is not required to speculate as to the meaning of a statute at the peril of his freedom. Lanzetta v.

State of New Jersey, 306 U.S. 451, 59 S.Ct. 618, 83 L.Ed. 888. The intent of the legislature must appear from the face of the statute. Standard Oil Co. v. State, supra."

In the same year, 1957, in State v. Homan, 38 Ala.App. 642, 92 So.2d 51, where a trial court had held Code 1940, T. 41, § 221, subdiv. 3, unconstitutional, we reversed. The opinion compasses a number of Alabama cases both of imprecise words and constitutional holdings:

"We are cited to the peeping tom case, Kahalley v. State, 254 Ala. 482, 48 So. 2d 794, 795. The gist of the offense there was for any male person to go 'near and stare * * * into any room * * * not his own or under his control, which is occupied by any female person * * *.' This case in turn is bottomed on the Fourteenth Amendment to the Federal Constitution via Winters v. People of State of New York, 333 U.S. 507, 68 S.Ct. 665, 92 L.Ed. 840, and other cases therein cited.

"And from the Kahalley decision sprang Connor v. City of Birmingham, 36 Ala.App. 494, 60 So.2d 474. The offense there was that no two persons of opposite sex (except man and wife and parent and minor child) shall occupy jointly and privately any room in any lodging house, hotel, etc.

"These cases illustrate what, in the absence of concepts of due process, would nevertheless be obnoxious criminal legislation. Thus in Kahalley the fallacy is exposed by the question, 'How far is near?' In Connor the language, though unambiguous, is so broad and sweeping as to raise a presumption that the legislator would not have so intended unless he had added all inclusive words, and absent the all inclusive words the courts would not attempt to re-legislate, 36 Ala.App. at page 499, 60 So.2d at page 477.

* · * * * * *

"Subdivision 3 of Section 221 [T. 41], supra, is severable * * *. * * * we are of the opinion that there is no denial of due process of law nor is the language of the subdivision so vague as to be meaningless. There are no imprecise words such as 'profiteering', 'necessity of life', State v. Goldstein, 207 Ala. 569, 93 So. 308, 'profit, gain or advantage, unusual in the ordinary course of legitimate business', State v. Skinner, 20 Ala.App. 204, 101 So. 327, 329, or 'near', Kahalley v. State, supra. See also Parisian Co. v. Williams, 203 Ala. 378, at page 383, 83 So. 122 at page 127. * * *"

Since the only stated standards for refusing a permit are those of welfare, peace, safety, health, decency, good order, morals or convenience, we—in addition to overbroadness—find these words, as related to a parade, procession or demonstration, either sufficiently lacking in preciseness or without a settled applicable common law meaning.

For example, in Hague v. Committee for Industrial Organization, supra, Roberts, J., aptly pointed out that peace on the streets could easily be achieved by suppression.

In the context of long drawn out resort to congested courts for relief, these stated "standards"—truly only sources of power, not means to an end—show § 1159 to be void on its face.

## VII.

### § 1159 IS VOID AS APPLIED

Yick Wo v. Hopkins, supra, held that, though a San Francisco ordinance aimed at fire hazards had a valid surface wording, yet its employment against only Chinese laundrymen was discriminatory.

Here we have no direct evidence of any other persons being charged with a breach of § 1159 on the same occasion as that of instant concern. Nevertheless, the bor-

derline case made here against Shuttlesworth, coupled with even less plausible presentations reviewed in Primm v. City of Birmingham, supra, and in two other cases decided here on the authority of Primm, at the same time as Primm, constitute a pattern of enforcement.

In addition to facts listed in the quotation from Judge Johnson's opinion in Primm (set out hereinabove), we excerpt also from the evidence of one of the arresting officers:

"Q * * * Were you informed by anyone that no permits had been issued for any such demonstrations?

"A Yes, sir. At roll call before we came to work they read out this ordinance number to us and said no one had received any permits to hold any kind of demonstrations downtown and they read out the ordinance to us."

And of similar import from Bentley v. City of Birmingham, 6 Div. 938, decided on authority of Primm, we extract:

"Q Is it a fact, Officer, that the fact that some people might come down in the downtown area with signs was discussed that morning at Police Headquarters?

"A It was.

"Q And was the section which Ann Bentley is charged with discussed also at that time?

"A Yes, it was.

"Q Who did you discuss it with, Officer?

"A I believe that the Sergeant read— or, either the Captain read out the ordinance and said it was a violation.

"Q Could you tell us just what he said with reference to this ordinance?

"MR. WALKER: We object. Well, go ahead and answer that.

"A If I remember correctly, at roll call they read a lot of different things, read auto stolen reports, and read a lot of things that come in there, and if I remember correctly, I believe they read out the ordinance and said carrying signs would be prohibited.

"Q Did they describe how big the sign had to be?

"A They did not.

"Q Was there anything else said there that you remember?

"A Not that I recall.

"Q Did they describe what type of conduct other than carrying signs would constitute an offense?

"A I don't recall any mention of conduct.

* * * * * *

"Q All that you know about it is that she had the sign on, she was not in the company of anybody, she was walking across the street, and in about six seconds she was arrested?

"A That is correct.

"Q She didn't create any disturbance, or block the street, or anything else other than that, is that right?

"A She did not.

"Q Didn't endanger anybody's safety, so far as you know?

"A She did not."

Officer ———— (on cross):

"Q Now, I believe you stated that you were at the roll call that morning when they gave you orders about making arrests for violation of 1159?

"A They didn't say make an arrest, they just told us what the ordinance number was in case someone was downtown with signs on.

"Q Wearing signs?

"A But, they didn't actually say go out and get them.

"Q Well, now, what were your specific orders with respect to people wearing signs downtown, if anything?

"A I don't recall any particular orders. They just notified us of what the situation—of what the City Code was pertaining to such an incident.

"Q And your understanding was that you were to arrest anybody with a sign on?

"A My understanding is to arrest anybody violating the City Code to my knowledge.

"Q We are not asking about the other sections in the City Code, we are asking specifically about 1159. Did you have specific orders to arrest anybody who was wearing a sign?

"MR. WALKER: We object to that, Your Honor.

"MR. SHORES: Your Honor, we are trying to find out whether or not he was given instructions to cover that these individuals blocked the street, or whether the individuals were creating a disturbance with signs, or just what type of sign.

"MR. WALKER: Your Honor, we are not trying the defendant on what the officer thought, or what orders he was under. The only evidence that will be considered is the evidence admitted here in this court room, and whether the officer was under instructions, or acted even without any. instructions, that can make no—have no bearing on the case, because it will be decided from the evidence that comes from the witness stand.

"MR. SHORES: But, since he did say he did have some instruction, the law was read to him, we want to question him about those instructions. They are the ones who brought that out. We didn't know about they had a little meeting and discussed what they were to do, so that is what we are trying to find out, Your Honor.

"THE COURT: You may ask him.

"Q * * * were you given any instructions or any orders as to what type of signs a person must be wearing before you could make an arrest?

"A No, I don't recall any such orders.

"Q They didn't tell you how large the sign was to be, or how small?

"A No, there was no mention as to size.

"Q Well, specifically what was said at this roll call with respect to 1159?

"A I don't remember the exact conversation. All I know they read out— they said Article 1159 will cover any demonstrations, or parades, or carrying signs downtown. They didn't mention what kind of—what the signs were to say, or what size, or what color or anything of that nature.

"Q In other words, they gave you instructions coupled with that reading as to what it would require to make the arrest? One of the requirements was that a person must have a sign on?

"A That's right.

"Q And that was all, and that is all you arrested them for, is that correct?

"A That is correct."

■ For a case to reach here after a city arrest, it must go through two tiers of judicial proceedings: *first*, a trial before the city recorder; and, *second*, on appeal from a conviction, a trial de novo in the circuit court.

■ Trial in the circuit court can only be had on the city attorney's filing (unless waived) of a new complaint.

Accordingly, a case might come before the recorder without counsel for the city being aware of the prosecution in detail before trial. In the circuit court, the city's attorney, under his client's instruction, is an indispensable actor.

This pattern of enforcement exhibits a discrimination within the rule of Yick Wo v. Hopkins, supra.

## IX.

## THERE WAS INSUFFICIENT EVIDENCE TO SUSTAIN THE CHARGE

■ In a city ordinance prosecution, the city must sustain its case by proof to the same degree required in case of an indictable offense, to convince the jury from the evidence beyond a reasonable doubt.

Here, we consider the proof weighed in this scale fails to show a procession which would require, under the terms of § 1159, the getting of a permit.

No evidence came in as to whether or not the pedestrians in question—fifty-two in number, about a football squad with attendants—acted as a cohesive unit as a military group would march.

■ The City failed to show whether or not other pedestrians were run off the sidewalk, blocked either in access, process or transit. No evidence showed whether or not the group disobeyed traffic lights or officers directing crossings. There was no evidence of jaywalking or wandering onto the roadway.

Were it not for the singing and clapping [13] and some spurts of activity indicative of the appellant being a puisne leader under Dr. King, in conjunction with the broad definition of "street" in the City Code

as embracing the public sidewalk alongside, we might not have gone to such lengths of demonstration.

The Georgia Court of Appeals, in Montgomery v. Mayor, etc., of Athens, 105 Ga. App. 57, 123 S.E.2d 339, where a number of men (bearing signs with slogans with scriptural citations) picketed the University of Georgia campus while the Attorney General of the United States spoke within, had this to say:

"The undisputed facts in this case show that the petitioners did not obstruct or interfere with either vehicular traffic or pedestrian traffic and were not engaged in any activity which would require a police escort to direct traffic in conjunction therewith. Not only did they not unreasonably burden and interfere with the normal use of the streets by the public in the City of Athens but the undisputed facts show that their activity did not burden or interfere with the normal use of the streets in any manner whatsoever. We are therefore of the opinion that the activity of the petitioners on this occasion did not constitute a parade as contemplated by the ordinance or by the usually accepted definition of a parade. * * *"

Here, the trial court erred in overruling the appellant's motion to exclude the evidence for want of a prima facie case.

## X.

## LIMITATION OF OPINION

When this case arose, Cox v. State of Louisiana, supra, was not announced. Freedman v. State of Maryland, supra, was waiting in the wings. The trial judge rested on a more vigorous Cox v. State of New Hampshire, supra.

We emphasize that we have only before us a walking on city sidewalks. In the use of the roadway probably less stringent standards of construction would prevail against the prosecutor.

---

13. State v. Hughes, 72 N.C. 25.

Moreover, we do not doubt the potentiality of the City's adopting an ordinance without suppressing free expression or locomotion. We quote from Cox v. State of Louisiana, supra, per Goldberg, J.:

"* * * The rights of free speech and assembly, while fundamental in our democratic society, still do not mean that everyone with opinions or beliefs to express may address a group at any public place and at any time. The constitutional guarantee of liberty implies the existence of an organized society maintaining public order, without which liberty itself would be lost in the excesses of anarchy. The control of travel on the streets is a clear example of governmental responsibility to insure this necessary order. A restriction in that relation, designed to promote the public convenience in the interest of all, *and not susceptible to abuses of discriminatory application,* cannot be disregarded by the attempted exercise of some civil right which, in other circumstances, would be entitled to protection. One would not be justified in ignoring the familiar red light because this was thought to be a means of social protest. Nor could one, contrary to traffic regulations, insist upon a street meeting in the middle of Times Square at the rush hour as a form of freedom of speech or assembly. Governmental authorities have the duty and responsibility to keep their streets open and available for movement. A group of demonstrators could not insist upon the right to cordon off a street, or entrance to a public or private building, and allow no one to pass who did not agree to listen to their exhortations. * * *

* * * * * *

"We have no occasion in this case to consider the constitutionality of the uniform, consistent, and nondiscriminatory application of a statute forbidding all access to streets and other public facilities for parades and meetings. * * *" (Italics added.)

Ordered liberty is the end for which we enforce laws, not the wish for self-immolation. On the bones of the martyrs to his tyranny man has never built a lasting system of Law.

Lord Acton in 1877 perceived the interplay between rights and duties, between competing claims of rights—saying:

"* * * At all times sincere friends of freedom have been rare, and its triumphs have been due to minorities, that have prevailed by associating themselves with auxiliaries whose objects often differed from their own; and this association, which is always dangerous, has been sometimes disastrous, by giving to opponents just grounds of opposition, and by kindling dispute over the spoils in the hour of success. No obstacle has been so constant, or so difficult to overcome, as uncertainty and confusion touching the nature of true liberty. If hostile interests have wrought much injury, false ideas have wrought still more; and its advance is recorded in the increase of knowledge, as much as in the improvement of laws. The history of institutions is often a history of deception and illusions; for their virtue depends on the *ideas* that produce and on the *spirit* that preserves them, and the form may remain unaltered when the substance has passed away." (Italics added.)

## X.

## CONCLUSION

 The appellant had standing to question the ordinance. Staub v. City of Baxley, supra; Freedman v. State of Maryland, supra.

We consider that (1) § 1159 of the 1944 General Code of the City of Birmingham, certainly as to the use of sidewalks by pe-

destrians, is void for vagueness because of overbroad, and consequently meaningless, standards for the issuance of permits for processions; (2) said § 1159 has been enforced in a pattern without regard to even the meaning here claimed for by the City to such an extent as to make it unconstitutional as applied to pedestrians using the sidewalks; and (3) the City failed to make a case, under the purported meaning of § 1159, of there being a need for the appellant in this case to be covered by a permit to use the sidewalk in company with others.

Therefore, the judgment below is due to be reversed and the appellant is due to be discharged sine die.

Reversed and rendered.

JOHNSON, Judge (dissenting).

The complaint filed in the circuit court by the City's attorney charges that appellant "did take part or participate in a parade or procession on the streets of the City without having secured a permit therefor from the commission, contrary to and in violation of Sec. 1159 of the General City Code of Birmingham of 1944."

The evidence, as introduced by the City, tended to show that during the afternoon of Friday, April 12, 1963, approximately 52 persons, most of whom were Negroes, departed from a church in the 1400 block of 6th Avenue North in Birmingham, grouped "in formation" on the sidewalk in front of the church, and then walked "in formation" along the sidewalks for several blocks. Their route followed east from the church along 6th Avenue North to 17th Street, then south along 17th Street one block to 5th Avenue North, and then east again along 5th Avenue North towards 18th Street. They were stopped by a policeman in the middle of the block between 17th and 18th Streets. "Spectators" lining the route fell in behind and followed the group in formation as they passed by. This crowd of "spectators"—consisting of several hundred persons—did not walk in formation and had no discernible organization. There were also a number of photographers present. The appellant, who is a preacher, left the church with the people who walked in formation. He was observed entering the church wearing a business suit, and when he left the church he was wearing a black shirt and "bluejean" trousers. Rev. Martin Luther King and Rev. A. B. Abernathy led the group in formation. They were dressed in attire similar to that worn by appellant. The group in formation sang and clapped hands as they proceeded along the sidewalk, but were otherwise orderly. No permit was issued for a parade or procession to be held on April 12, 1963. There is no evidence concerning whether anyone applied for such permit.

Police Officer R. N. Higginbotham, a witness for the City, was at 5th Avenue North and 18th Street when he first observed the alleged parade or procession. He testified that the group in formation turned on to 5th Avenue from 17th Street and proceeded east on the sidewalk on the north side of 5th Avenue, that this group was marching four to six abreast "all the way across the sidewalk", and that he stopped them in the middle of the block between 17th and 18th Streets. He stated that the crowd following the group in formation was in the center of the street, and also that he observed appellant in the group in formation, in the "third or fourth row back."

Police Officer Edward Ratigan, a witness for the City, testified that he followed the alleged parade or procession from the church on 6th Avenue to where it was stopped on 5th Avenue; that the group in formation consisted of 52 persons marching two abreast, approximately forty inches apart; and that this formation persisted until the group was stopped. He further stated that appellant was at no time in line with a partner in the marching group but was walking along side the group talking to them, and giving them encouragement. Police Officer Herman Evers testified that appellant was "bounding from the front to the rear" of the marching group "waving

his arms to come on, telling them to come on."

Appellant's evidence consists of the testimony of five witnesses, including himself. His evidence tends to. show that approximately 52 persons left the church on 6th Avenue North and walked two abreast on the sidewalks for several blocks; that appellant left the church with the group and walked a few blocks in the same direction; that he was not walking with a partner. in this group but was walking at times beside the group, counseling them to be quiet and orderly; that he also tried to prevent bystanders or spectators from joining the marching group; and that he left the scene before any of the group in formation was arrested. Appellant referred to the group in formation as "marchers."

Appellant contends that the court erred in overruling his motion to exclude the City's evidence because (1) there is no evidence of a parade or procession, (2) assuming arguendo there was a parade or procession, it occurred on the sidewalk and not in the streets as alleged in the complaint, and (3) there is no evidence that appellant took part or participated in such parade or procession.

The statute does not attempt to define a parade or procession. Parade is defined in Webster's New International Dictionary, Second Edition, as follows:

"Any march or procession; esp. a formal public procession; the movement of any body marshalled in something like military order; as, a parade of firemen; a circus parade."

Procession is defined in Webster's New International Dictionary, Second Edition, as follows:

"A group, esp. of persons or of vehicles containing persons, moving onward in an orderly, ceremonious, or solemn parade; as a religious procession; to go in procession to the capitol; to form a procession."

In Cox v. State of New Hampshire, 312 U.S. 569, 61 S.Ct. 762, 85 L.Ed. 1049, the Supreme Court of the United States had before it the question of whether a group of fifteen to twenty members of a religious sect marching along the sidewalk in single file carrying placards constituted a "parade or procession" within the meaning of a New Hampshire Statute prohibiting a parade or procession without a license. The question was answered in the affirmative by a unanimous court. Chief Justice Hughes, speaking for the court, stated:

"There appears to be no ground for challenging the ruling of the state court that appellants were in fact engaged in a parade or procession upon the public streets. As the state court observed: 'It was a march in formation, and its advertising and informatory purpose did .not make it otherwise. * *. * It is immaterial that its tactics were · few and simple. *It is enough that it proceeded in an ordered and close file as a collective body of persons on the . city streets'."* (Emphasis added.)

Here, the City's evidence establishes that a substantial number of persons, upon leaving the same church at the same time, gathered in formation in front of that church and while maintaining formation marched on the sidewalks along the streets for several blocks, two to six abreast. They were singing and clapping · their hands. The group was led and directed by ministers or preachers. The marchers attracted a crowd of spectators, and some photographers. This evidence established, in my opinion, a common intent to march on the streets as an organized, collective body of persons. It was a movement of a body of persons marshalled in something like military order. It was a "parade or procession" within the meaning of Section 1159, supra.

Appellant's contention that the parade or procession did not occur in the street is without merit. A look at Section 2 of the General City Code of Birmingham of 1944

discloses an intent to treat sidewalks as part of the streets. Section 2 reads in part:

"Sec. 2. Definitions and rules of construction.

"In the construction of this code and of all ordinances, the following definitions and rules shall be observed, unless the context clearly requires otherwise.

\* \* \* \* \* \*

"Sidewalk: The term 'sidewalk' shall mean that portion of a street between the curb line and adjacent property line."

In common parlance, a "sidewalk" is the part of a street assigned to the use of the pedestrians. Smith v. City of Birmingham, 42 Ala.App. 467, 168 So.2d 35.

A parade or procession may be held on the sidewalk as well as that part of the street set aside for vehicular traffic. See Cox v. State of New Hampshire, supra. Sec. 1159, supra, prohibits a parade or procession on any portion of the street, including the sidewalk.

The evidence clearly establishes that appellant took part or participated in the parade or procession. If we reject the testimony of Officer Higginbotham to the effect that appellant was in the group in formation, which I do not, the testimony of other police officers to the effect that appellant walked beside the marching group giving them instructions is sufficient to establish that he participated in the parade or procession. One who assumes duties similar to a drill sergeant in a military parade, as did appellant, takes part or participates in a parade or procession.

Appellant contends that Section 1159 "vests in the commission the power to restrain free expression without establishing reasonable standards for the use of such power," and therefore violates the First Amendment to the United States Constitution, which is protected against state action by the Fourteenth Amendment.

Although the right to engage in a parade is one phase of the exercise of the fundamental right of free speech and assembly, such right is subject to reasonable and non-discriminating regulation and limitation.

In Cox v. State of New Hampshire, supra, Chief Justice Hughes wrote:

"Civil liberties, as guaranteed by the Constitution, imply the existence of an organized society maintain public order without which liberty itself would be lost in the excesses of unrestrained abuses. The authority of a municipality to impose regulations in order to assure the safety and convenience of the people in the use of public highways has never been regarded as inconsistent with civil liberties but rather as one of the means of safeguarding the good order upon which they ultimately depend. The control of travel on the streets of cities is the most familiar illustration of this recognition of social need. Where a restriction of the use of highways in that relation is designed to promote the public convenience in the interest of all, it cannot be disregarded by the attempted exercise of some civil right which in other circumstances would be entitled to protection. \* \* \* As regulation of the use of the streets for parades and processions is a tradiional exercise of control by local government, the question in a particular case is whether that control is exerted so as not to deny or unwarrantedly abridge the right of assembly and the opportunities for the communication of thought and the discussion of public questions immemorially associated with resort to public places."

In Kuntz v. People of State of New York, 340 U.S. 290, 71 S.Ct. 312, 95 L.Ed. 28, Mr. Justice Jackson wrote that "[c]ities throughout the country have adopted the permit requirement to control private activities on public streets and for other purposes." Ordinances of this character have been in effect in most municipalities of

Alabama for many years. The authority to enact such ordinances is given by Section 455, Title 37, and Section 654, Title 62, Code of Alabama 1940.

It is the duty of this Court not to strike down a city ordinance as unconstitutional if by a reasonable construction it can be given a field of operation within constitutional limits. See City of Mobile v. Coffin, 28 Ala.App. 243, 181 So. 795. Where an ordinance is susceptible of two constructions, one of which will defeat the ordinance and the other will support it, the latter construction will be adopted. Birmingham Ry., Light & Power Co. v. Kyser, 203 Ala. 121, 82 So. 151. A municipal ordinance must be construed with a view towards the purpose for which it was adopted. City of Birmingham v. Mauzey, 214 Ala. 476, 108 So. 382.

I think it is obvious that this ordinance—Section 1159—was not designed to suppress in any manner freedom of speech or assembly, but to reasonably regulate the use of the streets in the public interest. It does not seek to control what may be said on the streets, and is applicable only to organize formations of persons, vehicles, etc., using the streets and not to individuals or groups not engaged in a parade or procession. The requirement that the applicant for a permit state the course to be travelled, the probable number of persons, vehicles and animals, and the purpose of the parade is for the purpose of assisting municipal authorities in deciding whether or not the issuance of a permit is consistent with traffic conditions. Thus, the required information is related to the proper regulation of the use of the streets, and the fact that such information is required indicates that the power given the licensing authority was not to be exercised arbitrarily or for some purpose of its own. The requirement that the applicant state the purpose of the parade or procession does not indicate an intent to permit the Commission to act capriciously or arbitrarily. The purpose may have a bearing on precautions which should

be taken by municipal authorities to protect parades or the general public.

Section 1159, supra, provides that the Commission shall issue a permit "unless in its judgment the public welfare, peace, safety, health, decency, good order, morals or convenience require that it be refused." I do not construe this as vesting in the Commission an unfettered discretion in granting or denying permits, but, in view of the purpose of the ordinance, one to be exercised in connection with the safety, comfort and convenience in the use of the streets by the general public. The standard to be applied is obvious from the purpose of the ordinance. It would be of little or no value to state that the standard by which the Commission should be guided is safety, comfort and convenience of persons using the streets, and, due to varying traffic conditions and the complex problems presented in maintaining an orderly flow of traffic over the streets, it would be practically impossible to formulate in an ordinance a uniform plan or system relating to every conceivable parade or procession. The members of the Commission may not act as censors of what is to be said or displayed in any parade. If they should act arbitrarily, resort may be had to the courts. It is reasonable to assume from the facts in this case that the Commission would have granted appellant a permit to engage in the parade if such permit had been sought. A denial would have been warranted only if after a required investigation it was found that the convenience of the public in the use of the streets at the time and place set out in the application would be unduly disturbed.

My conclusions are fully sustained by the decision in State v. Cox, 91 N.H. 137, 16 A.2d 508. In that case the court was called upon to determine the constitutionality of a state statute prohibiting a parade or procession on the streets without a permit from local authorities. The statute did not set out a standard for granting or refusing the permit. The court overruled the de-

fendant's contention that the statute vested unfettered control in the licensing authorities. In answering this contention, the court said:

"[T]he act is implicit in its requirement that the licensing authority act reasonably in granting or denying licenses, and with reference to the object of public order on the public ways. If it does not in express terms 'make comfort or convenience in the use of streets * * * the standard of official action' (Hague v. Committee for Industrial Organization, 307 U.S. 496, 516, 59 S.Ct. 954, 964, 83 L.Ed. 1423), the necessary inference is that it does, based upon the presumption in favor of the validity of legislation as reenforced by the express provision of the act bestowing 'delegated powers' upon the authority, as a grant intended to be only of due legislative power which may properly be delegated. The discretion thus vested in the authority is limited in its exercise by the bounds of reason, in uniformity of method of treatment upon the facts of each application, free from improper or inappropriate considerations and from unfair discrimination. A systematic, consistent and just order of treatment, with reference to the convenience of public use of the highways is the statutory mandate. The licensing authority has no delegation of power in excess of that which the legislature granting the power has, and the legislature attempted to delegate no power it did not possess."

The United States Supreme Court, in a unanimous decision, held that the statute, as construed by the Supreme Court of New Hampshire, violated no federal constitutional rights of the defendants. Cox v. State of New Hampshire, supra.

The construction adopted by the Supreme Court of New Hampshire is sound. I would place the same construction upon the ordinance here for review.

There is nothing in the record before us tending to show that the ordinance has been applied in other than a fair and non-discriminatory manner. I cannot agree that this case, coupled with Primm v. City of Birmingham, 42 Ala.App. 657, 177 So.2d 236, and the two cases decided on authority of Primm constitutes a pattern of enforcement. No violation of Yick Wo v. Hopkins, 118 U.S. 356, 6 S.Ct. 1064, 30 L.Ed. 220, has been argued, nor does such violation appear from the record or extrinsically.

So evanescent are the issues in the majority opinion, I most respectfully dissent.